THE STATE ex rel. CROW, Attorney-General, v. CITY OF ST. LOUIS et al., Appellants.

Division One, April 1, 1903.

1. **Public Funds:** REIMBURSING POLICE OFFICER FOR SUPPRESSING NUISANCE. A city has the right to appropriate public moneys to reimburse a police officer who, in an effort to kill a mad steer at large on a crowded street, shot a child, whose next friend recovered a judgment for damages against him, which he paid.

2. ———: ———: GENERAL RULE. The general rule of law is that if the act done by the officer in removing a public nuisance from a city was done by him as an officer and not as an individual nor for his individual profit, but that the liability was incurred by him while in the performance of his official duty and while within the legitimate scope and discharge thereof, the municipality has a right to indemnify him against loss. And if in such case a judgment is obtained against him the municipality can appropriate money from its public treasury to pay such judgment, costs and attorney's fees.

3. ———: ———: POWER UNDER CHARTER: PRESUMPTION OF OFFICIAL DUTY. Under the charter of the city of St. Louis the Municipal

Assembly, by the vote of two-thirds of the members of each house, has power to appropriate money out of the city treasury to reimburse a police officer, who, in obedience to orders, shot a mad steer amuck on a crowded street, and in doing so shot a boy, to whom he was subsequently, by judgment of court, compelled to pay damages. The provision in reference to the two-thirds vote applies to the whole section in which it is contained. And in the absence of a contrary showing the court will presume that the assembly did its duty and that the requisite two-thirds voted for the appropriation.

4. ———: ———: ———: PUNCTUATION. Neither grammatical construction, punctuation nor relative arrangement of the several parts of a section of an ordinance or statute, must be allowed to absolutely determine whether a qualifying clause at the end applies solely to the last antecedent clause or to the whole section. A common-sense interpretation is the safest rule, but the mischief to be remedied and the benefits to be secured by the law should always be borne in mind. And guided by this rule it is held in this case that a qualifying clause requiring a two-thirds vote, at the end of a section prohibiting the appropriation of public money for certain purposes, applies to the whole section and not simply to the last clause.

5. ———: ———: POWER UNDER CONSTITUTION. Nor is such appropriation in conflict with the Constitution. It does not make a donation of public money to an individual. It simply appropriates the expenses which a public officer incurred and paid while in the discharge of official duty on behalf of the municipality.

Appeal from the St. Louis City Circuit Court.—*Hon. Jas. E. Withrow*, Judge.

REVERSED.

*Johnson & Richards, Charles Claflin Allen, Charles W. Bates* and *William F. Woerner* for appellants.

(1) The passage of the ordinance was the exercise of a governmental function for the public welfare—a part of the police power. The municipal assembly had power to pass the ordinance in question under its powers by statute and charter, to preserve the public peace and order, and to protect life, liberty and property. (a) The Metropolitan Police Act of Missouri has always provided expressly that the city

of St. Louis "may pass ordinances for preserving order, securing property and persons from violence, danger or destruction, protecting private and public property, and for promoting the interests and insuring the good government of the city." Laws 1860-1, p. 447, sec. 1; R. S. 1899, sec. 6290.   (b)   The charter of the city gives power to the mayor and municipal assembly by ordinance "to appropriate money of the city for legitimate purposes and provide for its debts and expenses." Charter, art. 3, sec. 25, par. 1; R. S. 1899, p. 2484.   (c)   The city also has power by charter "finally to pass such ordinances not inconsistent with the provisions of this charter, or the laws of the State, as may be expedient in maintaining the peace, good government, health and welfare of the city." Charter, art. 3, sec. 26, par. 14; R. S. 1899, p. 2488.   (d)   The provisions of article 3, section 30 of the charter indirectly confirm this power by providing the method by which the municipal assembly "may ordain the payment of any demands not authorized and audited according to law," or exempt or relieve a citizen "from any burden imposed upon him by law." Charter, art. 3, sec. 30; R. S. 1899, p. 2489.   (2)   "The municipal corporation can indemnify its officials against any liabilities which they may incur in a bona fide performance of their duties, even though they may have exceeded their legal authority." Tiedeman on Mun. Corp., sec. 115; Beach on Pub. Corp., sec. 647; Dillon on Mun. Corp., sec. 147; Throop on Pub. Officers, sec. 495; Mechem on Pub. Officers, secs. 877-78-79.   (3) "The public or a public corporation has power to indemnify its officers and agents against any charge or liability they may incur in a bona fide discharge of their duties, even though their acts were illegal." 19 Am. and Eng. Ency. of Law, p. 541; Cullen v. Carthage, 103 Ind. 196; Lawrence v. McAlvin, 109 Mass. 311; Pike v. Middleton, 12 N. H. 278; Fuller v. Groton, 14 Gray 340; Sherman v. Carr, 8 R. I. 431; Bancroft v.

Lynnfield, 18 Pick. 566; Hadsell v. Hancock, 3 Gray 526; State v. Hudson County, 37 N. J. L. 254; State v. Hammonton, 9 Vroom 430; s. c., 20 Am. Rep. 404; Roper v. Laurinburg, 90 N. C. 427; Atty.-Gen'l v. Norwich, 2 Mylne & Cr. 406; Reg. v. Stamford, 4 Q. B. 900; Reg. v. Litchfield, 4 Q. B. 893.   (4)   The true test in the case at bar is the power of the city to preserve public peace and protect property; and it is not measured by the city's liability in an action brought against it. The police department is maintained solely for the public welfare as an agency of the State as well as of the city.   State ex rel. v. Mason, 153 Mo. 23; Carrington v. St. Louis, 89 Mo. 214.

*Charles S. Reber* for respondent.

(1)   Ordinance 19716, "For the relief of William Desmond," is repugnant to the charter of the city of St. Louis, and is therefore void.  Sec. 30, art. 3, charter.   (2)   It is also repugnant to the Constitution of the State, and for this reason is utterly void.  Sec. 46, art. 4, Constitution; sec. 3, art. 10, Constitution.  (3) Being a relief bill, it is plain usurpation of power on the part of the municipal assembly, and hence is of no legal validity.   Hitchcock v. St. Louis, 49 Mo. 484; Campbell v. St. Louis, 71 Mo. 106; State ex rel. v. St. Louis, 68 S. W. 901; Halstead v. Mayor, etc., 3 N. Y. 430; Vincent v. Nantucket, 12 Cush. 103; Gove v. Epping, 41 N. H. 539; Thorndike v. Camden, 82 Me. 39; Commissioners v. Bradford, 72 Ind. 455.

MARSHALL, J.—This is a proceeding by injunction to enjoin the city of St. Louis, its auditor and treasurer, from paying to the defendant, William Desmond, the sum of nine hundred and seventy-one dollars and thirty cents, pursuant to an ordinance of the city of St. Louis, numbered 19716, entitled, "An ordi-

nance for the relief of William Desmond," approved March 10, 1899. Said ordinance is as follows:

"19716.

"AN ORDINANCE FOR THE RELIEF OF WILLIAM DESMOND: Whereas, on the 6th day of July, eighteen hundred and ninety-two, a wild steer had escaped from the people who had charge of said animal, and was running loose upon the streets of the city of St. Louis, at or near the Four Courts building in said city; and said wild steer was charging upon the people of said streets; and there was danger that some one would be hurt thereby, and a number of persons were shooting at said animal in an endeavor to kill same and prevent accident to persons on said streets; among said persons firing shots at said animal being William Desmond, then and now acting as chief of detectives of the metropolitan police force of the city of St. Louis, who fired such shots at the instance and under the orders of his superior officer, Chief of Police L. Harrigan; that while said Desmond was leaning out of a window of the Four Courts building, firing a shot or shots at said animal, under said directions of his chief, a shot struck one Albert Tolch, a minor, who was standing on the north side of Clark avenue, opposite the said Four Courts building, and between Eleventh and Twelfth streets, which said shot may or may not have been fired by the said William Desmond, who was acting under orders from said Chief Harrigan, and was acting to the best of his ability in the discharge of his duty as a city officer at the time of firing such shot or shots; and,

"Whereas, afterwards, by his next friend, the said Albert Tolch brought a suit against Desmond in the circuit court of the city of St. Louis, claiming damages for being so injured, which suit was tried before a jury, which said jury rendered a verdict against said William Desmond, which resulted in a judgment against

Vol 174 mo—9.

him for fifteen hundred dollars which judgment he afterwards compromised for the sum of seven hundred and fifty dollars and costs, in all amounting to the sum of eight hundred and seventy-one dollars and thirty cents, and he also became liable for attorney's fees in the sum of one hundred dollars, making a total expended by him of nine hundred and seventy-one dollars and thirty cents; therefore,

"*Be it ordained by the municipal assembly of the city of St. Louis, as follows*:

"Section 1. The auditor is hereby authorized and directed to draw his warrant on the city treasurer, in favor of William Desmond, for the sum of nine hundred and seventy-one dollars and thirty cents, and take his receipt in full of all claims against the city of St. Louis. Said warrant to be charged to appropriation for relief of William Desmond.

"Sec. 2. There is hereby appropriated and set apart out of municipal revenue the sum of nine hundred and seventy-one dollars and thirty cents to fund for the relief of William Desmond.

"Approved March 10, 1899."

The petition charges that the ordinance "is contrary to the provisions of the charter of said city and in excess of the powers of said assembly, and is null and void."

The answer admits the passage of the ordinance, and that the city and its officers intend to carry it into effect; sets up the facts substantially as recited in the preamble to the ordinance, and asserts the power and authority of the city to pass the ordinance.

The plaintiff demurred, generally, to the answer. The court sustained the demurrer. The defendants refused to plead over, final judgment was entered upon demurrer for plaintiff, and the defendants appealed.

## I.

William Desmond is and at the times hereinafter mentioned was an officer of the metropolitan police force of the city of St. Louis, being the chief of detectives.

The board of police commissioners of St. Louis was created by the Act of March 27, 1861. [Laws 1860-1, p. 446.] The original act was amended by the Act of 1867 (Laws 1867, p. 178), and by section 11 of that act the members of the police force were expressly declared to be officers of the city and also officers of the State. This dual capacity was recognized as lawful, under the laws as they existed, by this court in Carrington v. St. Louis, 89 Mo. l. c. 214. Section 11 of the Act of 1867 was re-enacted as section 25 of the Act of 1899 [Laws 1899, p. 60].

By the terms of all the acts creating the board, the city of St. Louis is required to pay all the salaries and expenses of the police (except from 1864 to 1876 when the county of St. Louis was required to pay one-fourth thereof. [State ex rel. Police Commrs. v. County Court, 34 Mo. 546.] But upon the separation of the city and county in 1876 this obligation ceased).

Thus the predicates are established that the police of St. Louis are both State and city officers, and that the city is under obligation to pay the expenses of the force. The preamble to the ordinance recites, and the answer avers, and the demurrer admits, the fact to be that a mad steer was running wild in the city of St. Louis, and the people and their property were in imminent danger, when the chief of police ordered the defendant, Desmond, to shoot it, and thus prevent such threatened injuries; that such order came from said defendant's superior officer; that in obedience to said order he leaned out of the window and with due care shot at the steer; that other persons were also shooting

at the steer; that a shot struck a boy who was on the opposite side of the street, and that suit was brought by said boy against the defendant, Desmond, and a judgment rendered against him, and that the ordinance in question is intended to reimburse said defendant for the judgment and costs, which he was thus obliged to pay.

This establishes the further predicate that the liability which the defendant, Desmond, incurred and paid and which the ordinance is intended to relieve him from, was a liability incurred by him in the bona fide discharge of his duties as a police officer, as those duties are defined in the acts creating said police force. The Act of 1861 (Laws 1860-1, sec. 5, p. 448) made it the duty of the police to "preserve the public peace, . . . protect the rights of persons and property, guard the public health, . . . *prevent and remove nuisances* in all streets, highways, waters and other places." A mad steer, running wild on the streets of a populous city and threatening the lives of the people, is a nuisance on such streets. There was, apparently, on hand no gaily-attired matador, with red shawl and keen-edged sword to remove the animal with neatness and dispatch, nor was there a Bossie Mulhall to lasso and tie the steer with speed and grace. Under the circumstances and under the act aforesaid, it was clearly the duty of the police to remove the nuisance. It does not appear from the record how it fell out that Desmond could hit a boy on the opposite side of the street while leaning out of a window and shooting at a steer in the street below him. It would not be contended that he made a "bull's-eye" on that shot. In fact such a remarkable exhibition of marksmanship could not even be explained upon the theory that

"Many an arrow at random sent
Hits mark the archer little meant."

It rather depends for solution upon the precedent recorded in the nursery rhyme, "He shot at the goose

and hit the gander.'' In short, but for the fact that the verdict of the jury in the damage suit so declared, the idea that such a thing could have happened would not have been tolerated. But however it came about, it goes to show the state of discipline that existed in the force, and speaks volumes of praise to the spirit of obedience to orders that actuated Desmond; which in some degree, at least, compensates for the poor marksmanship displayed. The incident also goes to prove, most conclusively, that brains and not bullets are necessary to make a successful detective, and that Desmond earned his position and enviable reputation by the possession of a cool head. rather than by superior ability with a gun, and that even if he could not hit a mad steer, he could ''make a hit'' as the head of so efficient a detective force.

What he did, however, was done in the discharge of official duty, and was necessary to the protection of life and to the removal of a nuisance. It was done by him as an officer and not as an individual nor for his individual profit. He incurred a liability while in the performance of his duty and while in the legitimate scope and discharge of his duty. The general rule of law is that under such circumstances the municipal or other public corporation has a right to indemnify an officer against loss, upon the ground that the officer was acting for the town or corporation when he became liable. [Tiedeman on Municipal Corporations, sec. 115.] The true test in all such cases is, did the act done by the officer relate directly to a matter in which the city had an interest, or affect municipal rights or property, or the rights or property of the citizens which the officer was charged with a duty to protect or defend?

If it did, the city had a right to employ counsel to defend the officer and to appropriate funds to pay a judgment rendered against the officer. The cases illustrative of this rule are collated in the notes to section 115 of Tiedeman on Municipal

Corporations.    To the same effect are also Beach on Public Corporations, sec. 647; 1 Dillon on Munc. Corp. (4 Ed.), sec. 147; Throop on Public Officers, sec. 495; Mechem's Public Offices and Officers, sec. 877.    A few illustrations, furnished by the many cases cited by the text-writers, will suffice to point the rule. Appropriations of public funds to indemnify officers have been upheld in the following cases:    In favor of village trustees when sued for acts done in the discharge of their public duties (Powell v. Newburgh, 19 Johns. 284); in favor of an Indian agent for freight paid by him on supplies, in a sudden emergency (U. S. v. Stowe, 19 Fed. 807); in case of a suit for libel growing out of an officer's official report (Fuller v. Groton, 11 Gray 340); in a suit for false imprisonment on account of an arrest made by a town marshal (Cullen v. Carthage, 103 Ind. 196).    Many other cases are collated by Dixon, J., in State v. Hammonton, 38 N. J. L. (9 Vroom) 430.

The power to pass the ordinance in question was, therefore, fully vested in the city under the general law, and the ordinance is a valid ordinance, unless there is some special provision in the charter of St. Louis or in the Constitution of the State that takes away that power from the city of St. Louis.

The plaintiff contends that such prohibition is found in section 30 of article 3 of the charter of St. Louis, and in sections 46 and 47 of article 4 of the State Constitution.

Section 30 of article 3 of the city charter is as follows:

"The assembly shall not have power to relieve any citizen from the payment of any lawful tax, or to exempt him from any burden imposed upon him by law, or ordain the payment of any demand not authorized and audited according to law, nor shall the assembly have power to ordain or authorize the compromise of any disputed demand, or any allowance therefor or

therein, except as provided in the contract therefor, or the payment of any damages claimed for alleged injuries to person or property, except by ordinance and adopted by a vote of two-thirds of the members of each House, taken by yeas and nays."

Section 46 of article 4 of the Constitution is as follows:

"The General Assembly shall have no power to make any grant, or to authorize the making of any grant of public money or thing of value to any individual, association of individuals, municipal or other corporation whatsoever; provided, that this shall not be so construed as to prevent the grant of aid in case of public calamity.".

And so much of section 47 of article 4 of the Constitution as is material to the contention is as follows:

"The General Assembly shall have no power to authorize any county, city, town or township, or other political corporation or subdivision of the State now existing, or that may hereafter be established, to lend its credit, or to grant public money or thing of value in aid of or to any individual, association or corporation, whatsoever, or to become a stockholder in such corporation, association or company," etc.

It will be observed that section 30 of article 3 of the city charter covers five classes of subjects, which for the sake of convenience and perspicacity may be numbered and stated separately as follows: The assembly shall not have power:

1.  To release any citizen from the payment of any lawful tax.

2.  To exempt him from any burden imposed upon him by law.

3.  To ordain the payment of any demand not authorized and audited according to law.

4.  Nor to ordain or authorize the compromise of any disputed demand, or any allowance therefor or therein except as provided in the contract therefor.

5. To ordain the payment of any damages claimed for alleged injuries to person or property.

The section quoted after specifying these five prohibitions, then concludes with these words, "except by ordinance and adopted by a vote of two-thirds of the members of each House, taken by yeas and nays."

It will be observed that all these matters are contained in the same section and that there are no punctuation marks except commas employed.

The contention of the plaintiff is that the assembly is absolutely prohibited to do any of the things specified in the first, second, third and fourth classes, but that the prohibition is not absolute as to the fifth class above specified, and that as to such matters the assembly is given power to act, provided two-thirds of the members of each house vote in favor of such an ordinance. In other words the plaintiff contends that the words "except by ordinance and adopted by a vote of two-thirds of the members of each House, taken by yeas and nays," applies only to the fifth class of subjects and not to the other four classes of subjects. Or otherwise stated, that it applies only to its immediate antecedent and not to the whole section. Unless this contention is sound the section quoted can not be construed as a prohibition against the power of the Municipal Assembly to pass the ordinance in question, but on the contrary the converse of the contention must be true, to-wit, that the section quoted confers the power to pass the ordinance if two-thirds of the members voted therefor, and in the absence of allegation and proof that two-thirds of such members did not vote to pass this ordinance, it will be assumed that the assembly did its duty and that the requisite two-thirds voted for the ordinance. [State ex rel. Atty.-Gen. v. St. Louis, 68 S. W. 900.]

The history of the evolution of section 30 of article 3 of the charter of St. Louis, will serve to throw light upon the true meaning of the section.

Section 5 of article 3 of the charter of St. Louis of 1870 (Laws 1870, p. 467), provided as follows: "The city council shall not have power to relieve any citizen from the payment of any tax, or to exempt him from any burden imposed upon him by law."

There could be no room for doubt that as to these two subjects there was a clear and absolute denial of power in the city council under that section of the charter of 1870.

It is commonly believed that the cases of Hitchcock v. St. Louis, 49 Mo. 484, and Campbell v. St. Louis, 71 Mo. 106, were decided on the faith of, or at least were in some manner affected by, the provision of the charter of St. Louis of 1870 above quoted.

It is not clear, however, that such is the fact. It does not clearly appear from the report of the case of Hitchcock v. St. Louis, supra, whether it arose under the charter of 1870 or that of 1867 (Laws 1867, p. 56). An examination of the original transcript in that case shows that the ordinance in question was passed on February 8, 1870, and the suit was filed on February 10, 1870. The charter of St. Louis of 1870 was not approved until March 4, 1870. So that case arose before that charter went into effect. But the charter of 1867, under which that case arose, contained substantially the same prohibitions as the charter of 1870. Section 17 of article 2 of the charter of 1867, provided: "The city council shall have no power to exempt persons or property from license or taxation, or from the payment of burdens imposed upon them by law." It is to be observed that this section was not referred to or relied on by either counsel or court in the Hitchcock case. That was a suit "to test the validity of an ordinance passed by the city council of the city of St. Louis, by which the sum of $1,500 was appropriated out of the general revenue and ordered to be paid to the mother superior of St. Ann's Orphan Asylum and Widow's Home, as a donation from the city toward the main-

tenance and support of that institution.'' It was held
that: ''The donee is a mere private institution, not un-
der the control of the city and having no connection
with it. If the taxpayers' money can be taken and
given to it, it may be also to any other private corpora-
tion, or it may be distributed gratuitously to individ-
uals.'' There can be no difference between legal minds
that this case was properly decided, but it has no ap-
plication to the case at bar, and throws no light what-
ever upon the true meaning of section 30 of article 3
of the present charter, nor upon its ancestral sections of
the charters of 1867 and 1870.

The case of Campbell v. St. Louis, 71 Mo. 106,
arose under the charter of 1870, but the provision of
the charter above quoted was not referred to or relied
on at all. The facts in that case were that the Times
Company had a contract to do the city printing. The
company and the city disagreed as to the amount due
the company for printing done under the contract. The
essential difference was that the company claimed that
it was entitled to charge double the contract price per
line for rule and figure or tabular work. The admin-
istrative officers refused to allow it, and treated all
lines alike and applied the contract price to all alike.
The city council first adopted a resolution that the
''said company be allowed payment in full for printing
on their scale of prices for tabular matter.'' The city
officers still refused to allow the claim, and thereafter
the city council passed an ordinance for the relief of
the company, directing the auditor to draw his warrant
in favor of the company for the amount claimed.
Thereupon the plaintiff, as a citizen, instituted a suit
for an injunction to restrain the city from carrying the
ordinance into effect. The defendants demurred to the
petition. The circuit court sustained the demurrer,
and the plaintiff appealed. The St. Louis Court of
Appeals reversed the judgment of the circuit court.
The reasoning employed by the Court of Appeals was

that it was decided in Hitchcock v. St. Louis, 49 Mo. 484, that the city could not make a donation of public money as a gratuity; that the charter required the party having the contract for the public printing to do all the jobwork required, and that it should not be lawful to cause any printing to be done or paid for except as provided for by the article of the charter relating to public printing; that said article required that the contract for public printing should be let by the comptroller, by competitive bidding, to the lowest and best bidder; and that the power to let the contract being given to the comptroller the city council had no power in the matter except to make an appropriation to pay for the work—the opinion does not state who was vested with the power to determine the amount of work that had been done under the contract, but inferentially it might be said that the opinion regarded that power as vested in the comptroller. It was argued in that case that as ''a dispute had arisen between the city and the company as to the amount due the company growing out of a lawful contract, to settle which the parties might have had recourse to a court of justice, therefore, the city had a right to settle and adjust it by compromise out of court.'' But the Court of Appeals answered that contention by saying: ''The plain duty of the council would be to refer the subject to the courts of the State; and where it attempts, in place of this, to determine the validity of the claim and to provide for its payment, it is guilty of a plain usurpation of power and a wanton waste of the money of the city.'' The defendants appealed from this decision of the St. Louis Court of Appeals to this court, where by a ''Per Curiam'' opinion the opinion of the Court of Appeals was affirmed and adopted.

It will be observed that the prohibitions of section 5 of article 3 of the charter of 1870, were not referred to or relied on. Manifestly they were not applicable to that case.

These cases have been thus fully analyzed to show that they did not depend for their decision upon the provisions of the city charter which formed á part of the evolution of section 30 of article 3 of the present charter.

The present charter of St. Louis was framed by a board of freeholders in 1876, and was adopted by the people at an election held on August 22, 1876. Section 30 of article 3 was made up by taking section 5 of article 3 of the charter of 1870, and inserting the word "lawful" before the word "tax," and adding three classes of subjects thereto, and then adding the last clause as to the two-thirds vote being necessary. Thus the first two classes of subjects treated of in section 30 of article 3 of the charter of 1876 are the same as the two prohibitions of the charter of 1870. That is, they prescribe that the assembly shall not have power: (1) to release any citizen from the payment of any lawful tax; or (2), to exempt him from any burden imposed upon him by law.

With this as a foundation the framers of the charter of 1876 builded section 30 by adding thereto, "(3) or to ordain the payment of any demand not authorized and audited according to law; (4) or to ordain or authorize the compromise of any disputed demand, or any allowance therefor or therein, except as provided in the contract therefor; (5) or the payment of any damages claimed for alleged injuries to persons or property." And then was added the words, "except by ordinance and adopted by a vote of two-thirds of the members of each House, taken by yeas and nays."

Thus it will be observed that the first and second classes relate to excusing a citizen from paying money into the city treasury. The third class relates to paying money out of the treasury. The fourth class might result in the payment of money into or out of the treasury. The fifth class relates wholly to the payment of money out of the treasury.

Now the contention. is that by the qualifying clause at the end of the section it was intended to give the assembly power, by the prescribed vote, to sit as a quasi court and award and pay damages to a citizen for injuries done by the city to his person or property, but that the assembly had no power whatever to compromise a disputed claim, or to order the payment of any demand not authorized and audited according to law, or to exempt a citizen from any burden imposed upon him by law, or to relieve a citizen from the payment of any lawful tax. Or otherwise stated, that the wisdom and integrity of the assembly could be trusted to pay out money for damages for injuries to persons or property, and thus relieve the city of the expense incident to forcing every such matter into court, but that the assembly could not be trusted to compromise a disputed demand, which might result in the city paying or receiving more or less than its administrative officers claimed was right, and that as decided in Campbell v. St. Louis, ''the plain duty of the council [assembly] would be to refer the subject to the courts of the State,'' notwithstanding the costs in the case might exceed the difference in dispute. And further that the assembly could not be trusted to deal with the other three classes of subjects covered by the section in question. This contention necessarily means that the assembly could be trusted to pay out money for one class of municipal liabilities, but could not be trusted to pay out money for any other class of such liabilities and could not be trusted at all to deal with a citizen when it came to the question of the payment of money into the treasury, or the settlement of any question of a tax or burden due from or resting upon the citizen.

No reason is attempted to be given for this inexplicable difference of power in the assembly. The contention is based solely upon the cold words of the section, which it is said precludes all debate as to the

meaning or reason of the law.    As to the first two
classes of subjects it is said that the charter of 1870
absolutely denied power to the assembly to deal with
them, and as they were brought forward into the char-
ter of 1876, they must be still construed as absolute
prohibitions.    But if this be conceded to be the correct
meaning of that part of the section, it will not solve
the problem.    For neither the charter of 1870 nor any
previous charter contained any prohibition against
the assembly ordaining the payment of any demand
not authorized and audited according to law, nor any
prohibition against the assembly authorizing the com-
promise of a disputed demand.    So the argument that
the section intended that there should be an absolute
prohibition against the assembly doing any of those
acts, could not, be drawn from any prior laws, and
hence that reason for excluding the qualifying clause
at the end of the section from those classes of subjects
would not apply.

There is, therefore, no reason for thus restricting
the qualifying clause to the fifth class of subjects and·
not applying it to the other four classes.    And·"the
reason of the law is the life of the law."

But it is said that the general rule of law is that
in the absence of punctuation showing a different in-
tent, an exception or proviso in a statute applies only
to its immediate antecedent in the statute, and there-
fore the exception in this section applies only to the
fifth class of subjects.

Sutherland on Statutory Construction, section
267, thus states the rule:    "Relative and qualifying
words and phrases, grammatically and legally, where
no contrary intention appears, refer solely to the last
antecedent.    A proviso is construed to apply to the·
provision or clause immediately preceding."    But
after referring to the cases illustrative of the general
rule, the author, in the same section, adds:    "This
principle is of no great force; it is only operative when

there is nothing in the statute indicating that the relative word or qualifying provision is intended to have a different effect. And a very slight indication of legislative purpose or a parity of reason, or the natural and common-sense reading of the statute, may overturn it and give it a more extended application. . . . Qualifying words have been applied to several preceding sections where the nature of the provisions and the obvious sense required it. . . . Where the intention is manifest, a proviso, or qualifying words or clauses found in the middle of a sentence, may be placed at the end; or, when inserted in one section, they may be applied to the matter of another section." The many cases cited in the notes to the text afford ample illustration of the many instances in which the general rule has found exceptions. In fact, the exceptions have been applied oftener than the rule.

Dwarris' Treatise on Statutes (2 Ed.), p. 600, says: "When words are at the beginning of a sentence they may govern the whole. . . . When words are at the end of a sentence they may refer to the whole. Thus the words, *per legem terrae,* in cap. 29, of Magna Charta, being towards the end of the chapter, have been always held to refer to all the precedent matter. But if words are in the middle of a sentence and sensibly apply to a particular branch of it, can they be extended to that which follows? Agreeably to reason, and in grammatical construction, it would seem not; but as statutes are read without breaks and stops, it is not at any time clear that words belong to any particular branch of a sentence; it must be collected from the context to what they relate; and they are often, as will be seen, to be read distributively —*reddendo singula singulis.*"

Sedgwick on the Construction of Statutes (2 Ed.), p. 226, says: "A limiting clause is generally to be restrained to the last preceding antecedent." The author cites in support of this statement, the case of

Cushing v. Worrick, 9 Gray 382, but omits the very important words of that decision which complete the part of the sentence wherein the rule stated is laid down, which are, "unless there is something in the subject-matter which requires a different construction." [Idem, p. 385.]   But the same author (p. 225) says: "Common sense should prevail over strict grammatical rules, and punctuation should not control. [Gyger's Estate, 65 Pa. St. 311.]   The punctuation of a statute is not to be considered. [Cushing v. Worrick, 9 Gray 382; Hamilton v. Steamboat Hamilton, 16 Ohio St. (N. S.) 428.]"

A few illustrations from the many cases collated by the text-writers will point the rule and its exceptions. Thus:   A proviso in the first section of an act was held to apply to the second section of the act also. [Mechanics' & Farmers' Bank Appeal, 31 Conn. 63.] A proviso at the end of one section was held to extend to the whole act.   [United States v. Babbit, 1 Black (U. S.) 55; Mayor of Cumberland v. Magruder, 34 Md. 381; Great Western Railway Co. v. Swindon, Law Rep. 9 App. Cases l. c. 808; Eby's Appeal, 70 Pa. St. 311; Coxson v. Doland, 2 Daly 66; Hart v. Kennedy, 15 Abb. Pr. Rep. 290; Gyger's Est., 65 Pa. St. 311; State ex rel. Davis v. Forney, 21 Neb. 223; State ex rel. v. Turnpike Co., 16 Ohio St. l. c. 319; Fisher v. Connard, 100 Pa. St. l. c. 69.]

In Hart v. Kennedy, 15 Abb. Pr. 290, and in Coxson v. Doland, 2 Daly 66, a provision of the Metropolitan Police Act of New York was involved.   It provided that no member of the police force "shall be liable to military or jury duty, or to arrest on civil process, nor to service of subpoenas from civil courts, whilst on actual duty."   It was contended that the words, "whilst on actual duty," referred only to its immediate antecedent "nor to service of subpoenas from civil courts," and did not apply to the other precedents in the section. But the court said: "What-

ever may have been the object of this alteration, it is very plain that the substitution of the word 'or' for 'nor,' and of 'nor' for 'or,' has made no change in the meaning of the section, and the decision in the case of Hart v. Kennedy, is as applicable to it now as it was before. 'Or' is a conjunction, marking distribution, an alternative, or opposition, and the conjunction 'nor' performs the same office in negative propositions. The first is properly used in connection with *either* and the latter with *neither*. The use of both in this case was inadmissible, and as the negative 'shall not' was placed at the beginning of the sentence, the transposition of 'or' or 'nor' from one predicate to another could in no way affect the meaning.'' Accordingly it was held that the words ''whilst on actual duty'' applied to all the precedents in the section and was not limited to the immediate antecedent.

In Matthews v. Commonwealth, 18 Gratt. 989, two clauses in a section were transposed to make the section constitutional.

The American and English Ency. of Law (1 Ed.), volume 23, page 435, thus tersely defines the office of provisos, exceptions and saving clauses: ''A proviso is something engrafted upon an enactment, and is used for the purpose of taking special cases out of the general act and providing specially for them. An exception is a clause similar to the proviso, exempting from the operation of an enactment that which but for it would have been included. A saving clause is an exception of a special thing out of general things mentioned in the statute; it is ordinarily a restriction in a repealing act, and saves rights, pending proceedings, penalties, etc., from the annihilation which would result from unrestricted repeal. The particular intent expressed in a proviso or exception will control the general intent of the enactment. The proviso should be confined to what immediately precedes, unless a

contrary intent clearly appears; and should be construed with the section with which it is connected. This rule is not, however, absolute, and if the context requires, the proviso may be construed as a limitation extending over more than what immediately precedes, or may amount to an independent enactment.'' The cases cited in support or illustration of the text, are too numerous to be reviewed or analyzed here.

It is in the light of these cases, and these rules of law that section 30 of article 3 of the city charter must be read. Neither grammatical construction, punctuation nor relative arrangement of the several parts of the section must be allowed to absolutely control. A common-sense interpretation is the safest and surest to apply, bearing always in mind the mischiefs to be remedied and the benefits to be secured by the law.

There is nothing upon the face of the section which gives support to the theory that the framers of the charter intended to absolutely prohibit the assembly from legislating as to the first, second, third and fourth classes of subjects covered by the section, but intended to give the assembly power as to the fifth class, if two-thirds agreed to the ordinance. The character and nature of the subjects embraced in the section is not such as would suggest the denying of such power as to four of the classes and conferring it as to the fifth class. The mischiefs to be remedied did not require or suggest such a difference of power. In fact the mischief apparent from the history of the evolution of the section, that needed specifically to be remedied, from the standpoint of the city, was that created by the decision in Campbell v. St. Louis, 71 Mo. 106, which denied to the city the power to compromise a disputed demand and made it obligatory upon the city to agree with its adversary on its adversary's terms or else to throw the matter into court. The other mischiefs to be remedied were such as principally affected the rights of the citizen in his dealings

or relation with the city, and as to which no tribunal had any power to relieve the citizen, however gross the wrong suffered.   The lawmakers knew that under the prior charters the city had no power to relieve a citizen from the payment of a lawful tax nor to exempt him from any burden imposed upon him by law.   If the framers of the charter of 1876, had been satisfied with the working of the old rule on this subject, it is only reasonable to believe that they would have left these prohibitions, just as they were under the charter of 1870, in a section by themselves, and would not have placed them in a section with other matters and would not have placed them in a section which concluded with the words, ''except by ordinance and adopted by a vote of two-thirds of the members of each house taken by yeas and nays.''

The fact that those matters are so placed in the same section of the charter with the other three classes, and that the section concludes with the words quoted, is most conclusive evidence of the intention of the framers of the charter to change the inexorable character of the old law, and to provide for a more humane, reasonable, flexible and just method for the city and its citizens to meet and adjust their differences, and correct the mischiefs which always follow from any set of harsh and immutable rules.

This results in holding that the words ''except by ordinance,'' etc., at the end of section 30 of article 3 of the city charter, apply to all five classes of subjects covered by that section, and not simply to the fifth class, and that the ordinance in question is not prohibited by section 30 of article 3 of the charter.

This leaves for consideration only the contention that the ordinance in question violates the provisions of sections 46 and 47 of article 4 of the Constitution, which prohibit the General Assembly to grant, or to authorize any city to grant, any public money or thing of value to an individual.

Of this but little need be said. If the ordinance in question made a donation of public money to an individual it would be void, as was well said in Hitchcock v. St. Louis, 49 Mo. 484. But such is not the fact here. The ordinance only appropriates the expense that a public officer incurred and paid while in the discharge of his duty as such officer, in removing a nuisance from the public highway, which the law expressly required him to do, and which the city was under obligation to its citizens to do in the discharge of its police power and its health and safety duty.

Such expense was as much public expense as if a leper or person afflicted with smallpox or a violently insane person, with homicidal tendency, was found on a populous street or in a public park or public building, and it had become necessary to hire a carriage or ambulance to remove him. No one would deny that such an expense was properly a public expense, and that if any officer whose duty it was to remove such person had paid such expense, it would be not only competent but proper for the public to reimburse him. An act or ordinance appropriating money to pay such expense would not be a donation of public money to an individual.

The Am. and Eng. Ency. of Law (1 Ed.), volume 19, page 540, sums up the law on this subject as follows: "Public officers acting faithfully and without fault and pursuant to authority are entitled to be reimbursed for anything reasonably and necessarily disbursed by them in executing the duties of their offices, and the public or a public corporation has power to indemnify their officers and agents against any charge or liability they may incur in the bona fide discharge of their duty, even though their acts were illegal, or they had mistaken their legal rights and authority. But where the corporation has no duty to perform, no rights to defend, no interests to protect and no pecuniary or corporate concern in the subject-matter

connected with the discharge of the duties of the officer, it has no power to indemnify him."

Numerous and apposite cases are cited in support of the text.

Here the municipal corporation had a duty to perform, rights to defend, and interests to protect in removing or having removed, the nuisance from the streets. The officer acted bona fide, within the scope of his duties, lawfully. The indemnity was legal and proper.

It follows that the circuit court erred in sustaining the demurrer to the answer, and that the petition states no cause of action. The judgment of the circuit court is reversed. All concur.