## BRUCE C. DOUGLAS v. CITY OF MINNEAPOLIS AND OTHERS.

230 N. W. 2d 577.

May 30, 1975—No. 45093.

---

260

*Cohen & Douglas, Bruce C. Douglas,* pro se, and *Ronald E. Budd,* for appellant.

*Feinberg, Meyers, Schumacher & Schumacher, Walter J. Duffy, Jr.,* City Attorney, and *Raymond J. Hegna,* Assistant City Attorney, for respondent city, officials and policemen.

*Duane W. Krohnke* and *William Kampf*, for respondent claimants.

MACLAUGHLIN, JUSTICE.

Plaintiff, Bruce C. Douglas, on behalf of himself and other taxpayers of the city of Minneapolis, brought this action against the city of Minneapolis, its aldermen, its city treasurer, and others to enjoin the city from paying judgments entered against three of its policemen in the United States District Court for the District of Minnesota. Plaintiffs appeal from a summary judgment granted to defendants by the trial court.

The judgments against the policemen arose out of a civil action brought in the United States District Court by David Lykken and others.[1] The action was commenced pursuant to 42 USCA, § 1983, for damages for claimed deprivation of rights, privileges, and immunities secured by the United States Constitution or Federal law.

The events which gave rise to the United States District Court lawsuit occurred on the evening of Saturday, May 9, 1970, at the home of David and Harriet Lykken and their son, Jesse. All of the other Federal plaintiffs were guests in the Lykken home that evening. Lykken, who is a professor at the University of Minnesota, had agreed to hold an "open house" intended to raise money on behalf of an ad hoc group called "People Against Missiles," which had been formed by several university students for the purpose of organizing opposition to a proposed anti-ballistic missile installation in North Dakota.

Beer, coffee, and soft drinks were available at the party, and it was intended that those in attendance would make contributions to the cause in return for partaking of the refreshments. David Lykken supplied the beer for the party and had on hand for the occasion several cases of so-called "strong beer," classi-

---

[1] The plaintiffs in the United States District Court action will be referred to as the Federal plaintiffs.

fied under ordinances and statutes as requiring a license for its sale.

As part of the publicity for the fundraiser, a mimeographed flyer was distributed at the university. The flyer described the purpose of the organizing group and extended an invitation to the fundraiser. In reference to the fundraiser, the flyer contained the words "donation and cash bar." Prior to the gathering, a member of the Minneapolis Police Department came upon one of the flyers and gave it to one of the defendant officers, Kenneth Tidgwell, who was a member of the Minneapolis Police Department Morals Squad. Tidgwell showed the flyer to Jon Prentice, the head of the Morals Squad, who told Tidgwell to handle it in the usual manner. Tidgwell consulted with Assistant City Attorney Edward C. Vavreck, who also told him to handle it in the usual manner.

Tidgwell testified at the United States District Court trial that he was not interested in the political views expressed in the flyer; that his attention was attracted to it simply because of the words "cash bar"; that by the location given for the party he knew no liquor license had been issued for the premises; and that, consequently, if a cash bar were in fact operated it would be illegal. Thus, when advised to handle the situation in the usual manner, he proceeded to send an undercover officer to the scene to attempt to make a purchase. If the purchase were accomplished, an arrest could be made without a warrant for a misdemeanor committed in the presence of a policeman.

Accordingly, on the evening of May 9, 1970, after showing them the mimeographed flyer, Tidgwell instructed defendant police officers Gordon G. Haertel and John G. Searles as to how the matter should be handled. At about 10 p. m., Haertel arrived at the Lykken home where he identified himself by name, but did not reveal that he was a police officer. Searles, his partner, waited in their patrol car, parked some distance away. In the house were two small baskets for the collection of money. One, in the living room, was labeled "ABM donations." The other, in

the kitchen near the refrigerator where the refreshments were kept, was labeled "Donations, Beer 50¢, Pop 25¢, Power to the People." Haertel proceeded to the kitchen where Jesse Lykken gave him a beer from the refrigerator. No request for money was made, but Haertel gave Jesse Lykken a marked $5 bill for the beer and received change from the basket in the kitchen. Haertel stayed at the fundraiser for about an hour and then left to report to Searles and to Tidgwell via police radio. Searles and Haertel then met Tidgwell and several other officers at a location about one mile from the Lykken home. At that time, Tidgwell announced the plan for arresting everyone present at the Lykken home. Haertel and Searles returned to the fundraiser where they received more beer from the refrigerator and put another marked bill in the basket.

Thereafter, other Minneapolis policemen knocked and entered both the front and back doors of the Lykken home. It was announced that everyone was under arrest, and all the guests were told to gather in the living room. While some officers watched over the arrestees, others began to search the house. There is a dispute as to the thoroughness of the search, with the officers testifying that they only made a cursory inspection to determine if anyone else was obviously present in the house, while other evidence from the plaintiffs indicated the search was more thorough. On the main floor Officer Tidgwell seized virtually every piece of paper in sight, including not only anti-war literature that had been placed out for people to read but also personal papers off a small desk, and a pile of papers relating to the personal interests of Harriet Lykken that had been placed on a built-in buffet in the dining room. The police also seized the beer remaining in the house and also seized wine stored in the basement and liquor located in a closed cabinet on the first floor. Neither the wine nor the liquor had been served to anyone at the party.

David Lykken and all of the guests were then taken to the Hennepin County jail in downtown Minneapolis. Harriet and Jesse

Lykken were issued citations rather than being taken to the jail. At the Hennepin County jail, all those arrested were booked, charged with participating in a disorderly house, fingerprinted, photographed, and then released after periods of detention ranging from 37 minutes to 5 hours. Upon arriving downtown with the seized property, Tidgwell notified the local office of the F.B.I. concerning the identity of those arrested and the nature of the literature seized, but the F.B.I. agent stated that he had no reason to be interested in the matter. Subsequently, those arrested appeared in Hennepin County Municipal Court, but all charges were eventually dismissed for lack of probable cause to charge the guests with presence in or participation in a disorderly house. The complaint against David Lykken for selling liquor without a license was dismissed in Hennepin County Municipal Court "on the grounds of no prima facie case."

In the United States District Court action under 42 USCA, § 1983, it was necessary for the Federal plaintiffs to show (1) action taken under color of state law; and (2) a resulting deprivation of rights, privileges, or immunities secured by the Constitution or by Federal law. Since there was no question that the defendant police officers' actions were taken "under color of state law," the question to be determined in the United States District Court was whether those actions resulted in the deprivation of the Federal plaintiffs' rights. Without setting forth in detail the reasoning of the United States District Court, it found that the arrests "were improperly motivated, undertaken not in furtherance of good faith law enforcement but for the purpose of harassing those at the gathering because of their political beliefs, and the arrests were thus illegal." The United States District Court went on to hold that "the police were interested not in good faith law enforcement but in using the arrests as a pretext for seizing any and all potentially damning evidence of any possible law violation that might serendipitously be turned up." The court concluded that the police action represented a blatant disregard for the constitutional rights of the Federal plaintiffs

and determined that each Federal plaintiff was entitled to compensatory damages and that David, Harriet, and Jesse Lykken were, in addition, entitled to punitive damages. An award of $500 was made to each of the 17 Federal plaintiffs other than the Lykkens, and an award of $3,500 was made to each of the Lykkens.

Prior to the United States District Court action, the defendant police officers requested the city attorney to provide their defense pursuant to Minn. St. 471.44. Pursuant to a Minneapolis City Council resolution, the city attorney did provide the legal defense for the policemen in that action.

Upon request from the policemen, the Minneapolis City Council, in December 1973, approved the payment from public funds of the judgment entered against the three officers, subject to a favorable determination by the Hennepin County District Court in the instant litigation; which was then pending. The trial court, in this action, held that the city council has full discretion under § 471.45 to determine whether the city should pay judgments on behalf of its employees and officers if it deems doing so fit and proper. Thereafter, the city paid the United States District Court judgment, and plaintiff taxpayers in the instant action filed their notice of appeal to this court.

The issues involved in this appeal are: (a) Has the city power to pay the judgment against the officers, and if so what standard should be used by the city in determining whether the judgment should be paid? (b) Assuming the city had the power to pay the judgment, is the decision of the city subject to review on appeal to the district court, and what is the scope of that review? (c) What disposition should be made of the appeal in this case?

■ At the outset we must determine whether the city of Minneapolis has the power to pay the judgment in question and, if so, what standard should be applied by the city in deciding whether to exercise its power.

This court has had the opportunity, on at least two occasions, to consider questions similar to those raised in this appeal. In

City of Moorhead v. Murphy, 94 Minn. 123, 102 N. W. 219 (1905), a case in which a police official was sued for false arrest and imprisonment, we established that a municipality, in its discretion, may indemnify an officer for the expenses of his legal defense where the officer was acting in good faith in the performance of his official duties. In State ex rel. Feist v. Foot, 151 Minn. 130, 186 N. W. 230 (1922), we were faced with the issue of whether a city board of water commissioners had the authority to reimburse an employee for damages which he had been compelled to pay to persons injured through the employee's negligent operation of an automobile. In that case, we quoted, with approval, the following standard from State ex rel. Crow v. City of St. Louis, 174 Mo. 125, 133, 73 S. W. 623, 625 (1903):

" * * * The true test in all such cases is, did the act done by the officer relate directly to a matter in which the city had an interest, or affect municipal rights or property, or the rights or property of the citizens which the officer was charged with a duty to protect or defend?"

After applying this standard to the facts of the Feist case, we concluded that the commissioners could not properly reimburse the employee.

Minn. St. 471.44, which was first enacted in 1937, provides:

"On and after the passage of Laws 1937, Chapter 442, every city, town, or county of this state employing sheriffs, police officers, or peace officers *shall be required to furnish legal counsel* to defend any sheriff, deputy sheriff, police officer, or peace officer employed by any such governmental subdivision *in all actions* brought against such officer to recover damages *for alleged false arrest or alleged injury to person, property or character, when such alleged false arrest or alleged injury to person, property or character was the result of an arrest made by such officer in good faith and in the performance of his official duties* and pay the reasonable costs and expenses of defending such suit, including witness fees and reasonable counsel fees, not-

withstanding any contrary provisions in the laws of this state or in the charter of any such governmental subdivision." (Italics supplied.)

As is apparent, § 471.44 imposes a mandatory duty on a municipality to furnish legal counsel to defend a police officer in an action for damages if the municipality finds that the officer acted in good faith and in the performance of his duties. Thus, § 471.44 goes beyond the common law as stated in City of Moorhead v. Murphy, *supra*, which had left the furnishing of legal counsel to the discretion of the municipality, assuming the officer was in the performance of his duties and had acted in good faith.

Section 471.45, also enacted in 1937, provides:

"If, at the termination of such suit, judgment is rendered in favor of the defendant and against the plaintiff, such judgment for costs and disbursements shall be assigned to such governmental subdivision by such officer, and all moneys collected thereon shall be paid to such governmental subdivision. If judgment be rendered in such action against such officer, such governmental subdivision so employing such officer is hereby authorized to appropriate moneys from any funds available to pay such judgment, *if, in the discretion of the governing body of such governmental subdivision, it seems fitting and proper to do so.*" (Italics supplied.)

It is clear that under § 471.45 a municipality has the power to pay a judgment against an officer if in the discretion of its governing body "it seems fitting and proper to do so."

Having established the power of the municipality to pay the judgment, we must now determine the standard to be applied by a municipality in deciding whether to exercise this power.[2] Appellants urge us to hold that the municipality, as a condition

---

[2] The trial court took the position that there are no limitations on the power of the city to pay a judgment under Minn. St. 471.45. While we agree that the municipality's discretion under that statute is very broad, we do not believe it is unfettered.

to paying a judgment under § 471.45, must find that the officers were acting in good faith at the time of the events which led to the judgment.[3] Persuasive arguments have been advanced by both parties on the question of whether there must be good faith on the part of the officer before a judgment can be paid. Section 471.45 itself does not use the term "good faith" although it can be, and is, argued that the good-faith requirement of § 471.44 should be carried over into actions taken under § 471.45.

However, as we have noted, good faith is significant under § 471.44 because it *requires* a municipality to pay the legal expenses for its employees acting in good faith. Section 471.45 seems intended by the legislature to impose a considerably greater degree of discretion upon the municipality using, as it does, the very broad language, "if, in the discretion of the governing body of such governmental subdivision, it seems fitting and proper to do so." After considerable study, we have concluded that the omission of a specific requirement of good faith in § 471.45 was a deliberate and intentional act by the legislature because of its desire that the range of discretion of a municipal governing body be exceedingly broad in deciding whether to pay a judgment under § 471.45.

While we believe the circumstances would be limited and in-

---

[3] Appellants also argue that the findings of the United States District Court must be binding upon the city of Minneapolis in this case. We decline to so hold. The city of Minneapolis was not a party, or in privity with a party, in the Federal court action. While the city did provide a legal defense for the officers, that, standing alone, is not sufficient to cause the city itself, or its governing body, to be bound by the factual determinations of the United States District Court. Further, it is entirely possible that for purposes of the exercise of its discretion under Minn. St. 471.45 the city could reach one determination based upon the facts; and the Federal court for purposes of 42 USCA, § 1983, could reach another determination. However, the findings of the Federal court are certainly one factor which the governing body could take into consideration in exercising its broad discretion under § 471.45.

frequent in which a municipality would choose to pay a judgment in a case in which the employee's acts were not in good faith, we decline to preclude such a payment where the governing body for reasons of overriding importance to the community, such as the morale of the police force, the unique or compelling facts of a particular case, or the welfare of the community, might decide otherwise. Likewise, as we read the statute, there could be circumstances in which the governing body might exercise its discretion against paying a judgment even though the officer had acted in good faith. Again, this would occur, as we discern it, only on limited and infrequent occasions. It is entirely understandable that the legislature would require a governmental subdivision to provide a legal defense where an officer has acted in good faith while, at the same time, it would not mandate that the municipality must make payment of a judgment which is obtained against the officer in the event he does not successfully defend himself in the lawsuit. Obviously, if the officer has acted in good faith, he is entitled to a defense during his day in court. On the other hand, once he has been found at fault, and a judgment obtained, the municipality should have the broad discretion which we believe was given under § 471.45 to determine whether the judgment should be paid.

We are convinced, however, that there must be limits beyond which the discretion of the governing body cannot be extended. In seeking to find those limits, we are aided by legislative language found in c. 466. Chapter 466, enacted in 1963, deals with the tort liability of political subdivisions; and § 466.07, subd. 1, contains a provision for the indemnification of municipal officers and employees for a tort claim or demand. Section 466.07, subd. 1, provides, in part, as follows:

"The governing body of any municipality may defend, save harmless, and indemnify any of its officers and employees, whether elective or appointive, against any tort claim or demand,

whether groundless or otherwise, arising out of an alleged act or omission occurring in the performance of duty." [4]

Section 466.07, subd. 2, declares the following exception to the indemnification power granted in subd. 1:

"The provisions of subdivision 1 do not apply in case of malfeasance in office or wilful or wanton neglect of duty."

We find in § 466.07, subds. 1 and 2, a strong indication of the breadth of discretion which the legislature intended to grant to municipalities in determining whether to indemnify or pay a judgment against its officers or employees. At the same time, § 466.07, subd. 2, clearly places certain legislative limitations on the discretionary authority of a municipality, and we have concluded that the same limitations should be incorporated into § 471.45. We therefore hold that a municipality may pay a judgment against an officer or employee pursuant to § 471.45 if it deems it "fitting and proper to do so," assuming that the actions of the officer or the employee which lead to the judgment occur in the performance of duty and do not arise as a result of malfeasance in office or wilful or wanton neglect of duty.

In determining whether it is fitting and proper to pay a judgment, the municipality may consider, among other things, whether the employee acted in good faith; whether he was acting pursuant to directions from a superior officer; whether the morale of other city employees might be significantly affected by paying, or failing to pay, the judgment; and such other factors as, in the judgment of the governing body, may be reasonably relevant and helpful in reaching a conclusion that payment should or should not be made. The important principles are: (a) The governing body must first determine that the action arose out of the performance of the employee's duty and that there was

---

[4] The trial court treated the instant action as one to be determined under Minn. St. 471.45 rather than § 466.07. Because § 471.45 appears to be specifically designed to provide for judgments of the kind involved here, we have also based this decision on that statute.

no malfeasance in office or wilful or wanton neglect of duty; (b) the municipality must then determine whether it is "fitting and proper" to pay the judgment; (c) the determination of whether it is "fitting and proper" to pay the judgment must be based upon the best interests of the municipality and the public after considering all of the facts and circumstances. The governing body, in reaching its conclusion, should state, in writing, the reasons for its decision and should maintain whatever other record might be appropriate in the event a district court review of its action is demanded, as discussed herein.

■ The next issue to be resolved is whether a district court review of the governing body's action is available and, if so, the scope of that review. The trial court took the position that once "[t]he council has made [its] determination * * * neither this Court nor any other court can properly interfere with that determination."

While we have concluded that the municipality's exercise of its discretion under the grant of authority found in § 471.45 is very broad, we do not agree that it is beyond judicial review. It is abundantly clear that a governmental body may not expend public funds unless the primary purpose of the expenditure is public. See, Behrens v. City of Minneapolis, 199 Minn. 363, 271 N. W. 814 (1937). Courts may review such expenditures to determine if they serve a public purpose; to determine whether a municipality has exceeded its power in making an expenditure; and to determine if the action of the municipality was so arbitrary, capricious, and unreasonable as to justify interference. Arens v. Village of Rogers, 240 Minn. 386, 61 N. W. 2d 508 (1953); Borgelt v. City of Minneapolis, 271 Minn. 249, 135 N. W. 2d 438 (1965). We therefore hold that a proper party may seek review in district court of a municipality's exercise of its discretion to pay a judgment under § 471.45.

Upon review, the district court is obligated to determine (a) if the governing body erred in deciding that the action arose out of the performance of the employee's duty, (b) if the governing

body erred in determining that there was no malfeasance in office or wilful or wanton neglect of duty, and (c) if the governing body erred in deciding to pay the judgment. Because of our belief that the legislature intended wide discretion to be vested in the governing body, we have concluded that the scope of review must, of necessity, be narrow. Therefore, we hold that the district court is limited to a resolution of whether the determinations of the governing body were arbitrary, capricious, and unreasonable under all the facts and circumstances of the case. In applying this scope of review, the trial court should be guided by our statement in Sabes v. City of Minneapolis, 265 Minn. 166, 171, 120 N. W. 2d 871, 875 (1963):

"* * * In reviewing the proceedings of the municipality it is not the court's function to pass on the wisdom of the [payment], but only to determine whether the council exercised an honest and reasonable discretion, or whether it acted capriciously, arbitrarily, or oppressively." [5]

We further hold that the burden of proving that the governing body's determination was arbitrary, capricious, and unreasonable must rest upon those contesting the municipal action, in this case the appellant taxpayers.

■ This leads us to the last issue, which is the determination of the disposition of this appeal. Appellants made no attempt to

---

[5] In Bainbridge v. City of Minneapolis, 131 Minn. 195, 198, 154 N. W. 964, 965 (1915), a case which involved the same question of the scope of review of a discretionary act of a municipality, we said: "As stated above, the statute gives the mayor power to revoke licenses. This power of the mayor is not an absolute power to revoke. It cannot be used capriciously, or arbitrarily or oppressively, but only in the exercise of an honest and reasonable discretion. * * *

"* * * It is true there must be some facts which invoke the exercise of official discretion and furnish reasonable justification for the course followed * * *. If the question be doubtful and there is room for honest difference of opinion, and the determination of the question requires judgment and discretion, the action of the officer will be conclusive upon the courts."

show that the Minneapolis City Council's action was arbitrary, capricious, and unreasonable. Instead, appellants relied upon the findings of the United States District Court which, as we have indicated,[6] were not binding upon the municipality in determining whether to pay the judgment pursuant to its power under § 471.45. Both parties made motions for summary judgment and rested upon the same record which is now before us. According to that record, at the time the payment of the judgment was considered by the claims committee of the city council, the city attorney advised it that the city council was not bound by the United States District Court's findings and that the judgment could be paid if the city council determined that the defendant policemen had acted in good faith. Subsequent to that advice, the claims committee voted to recommend to the city council that the judgment be paid, and on December 21, 1973, the council itself voted to pay the judgment. Therefore, it would appear that the governing body at least implicitly found good faith on the part of the officers. Further, again as part of the record, we find a resolution of the Minneapolis City Council, dated May 28, 1965, and approved by the mayor on June 4, 1965, which reads as follows:

"Resolved by the City Council of the City of Minneapolis:

"That the City of Minneapolis shall defend and save harmless and indemnify any of its officers and employees, whether elective or appointive, against any tort claim or demand, whether groundless or otherwise, arising out of an alleged act or omission occurring in the performance of duty, when requested, in writing, by the officer or employee involved.

"Be it Further Resolved that this resolution shall not apply in cases of malfeasance in office, or wilful or wanton neglect of duty, or intoxication of the officer or employee involved."

Again, based upon this resolution, it appears that the city council in voting to pay the judgment implicitly decided there

---

[6] See, footnote 3, *supra.*

had been no malfeasance in office or wilful or wanton neglect of duty.[7] While the trial court did not expressly base its order for summary judgment on a finding that the city of Minneapolis had not acted arbitrarily, capriciously, and unreasonably in paying the judgment, and while that technical failure might justify returning the case to the trial court for such a determination, we have concluded, based upon our review both of the facts and of the record of the proceedings before the city council, that nothing would be gained by such a remand because the record before the trial court on remand would be essentially what is before us on this appeal. Therefore, we hold, as a matter of law, based upon the facts and the record before us, and applying the narrow scope of review which we have delineated in this opinion, that the city council did not act in such an arbitrary, capricious, and unreasonable manner as to justify setting aside its discretionary act in paying the judgment in question.[8] The judgment of the trial court is affirmed.[9]

Affirmed.

---

[7] The judgment against the officers obviously arose out of actions during the performance of their duties.

[8] We are aware that a certain portion of the judgment in question constituted punitive damages. While the municipality should obviously much more carefully scrutinize a judgment which includes punitive damages in exercising its discretion under Minn. St. 471.45, we hold, based upon the reasoning of this decision, that punitive damages may also be paid when the municipality is acting under § 471.45. The fact that punitive damages may not be awarded against a municipality under § 466.04 does not preclude the payment by the city under § 471.45 of a judgment against one of its officers which includes punitive damages.

[9] Our role in this appeal is not to determine whether the judgment against the officers should have been paid by the city. If the matter had been presented to us in the first instance, we might well have decided that the judgment should not be paid. However, as stated in this opinion, the role of the courts in a decision of this kind is to determine whether the governing body acted in an arbitrary, capricious, and unreasonable manner in reaching its determination to pay the judgment. We have concluded that it did not.

OTIS, JUSTICE (dissenting).

The evidence that these police officers were guilty of willful and wanton neglect of duty is virtually undisputed. There are no mitigating circumstances set forth in this record to justify their calloused disregard of the rights of innocent and law-abiding citizens. The award of punitive damages against them belies their claim of good faith.

The use of taxpayers' money to save harmless these defendants is in my opinion a clear violation of Minn. St. 466.07, subd. 2, which prohibits indemnity "in case of malfeasance in office or wilful or wanton neglect of duty." If we are to hold as a matter of law that the city of Minneapolis was justified in finding that these officers acted in good faith, it is difficult to imagine any situation where the statutory limitations of § 466.07 will apply.

I would require at the very least that the city council conduct a full hearing and make findings of fact which a trial court can review to determine whether there has been compliance with the statute.