STATE OF NEBRASKA EX REL. EMIL JOHNSON, JR. ET AL., APPELLANTS, V. COUNTY OF GAGE, NEBRASKA, APPELLEE.

49 N. W. 2d 672

Filed November 9, 1951.   No. 33005.

*Towle, Young & Mattson,* for appellants.

*William B. Rist* and *Walter A. Vasey,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Appellants brought this action to enjoin appellee from selling crushed rock produced and owned by it to the general public. The trial in the district court resulted in a judgment of dismissal of the case. This appeal contests the correctness of the judgment and the order denying a motion for a new trial.

The appellants alleged that they were taxpayers of Gage County, Nebraska; that appellee had been and was, without authority of law, engaged in the business of operating a stone quarry, producing crushed rock, and selling it in the open market to the general public in competition with a similar privately owned enterprise in a nearby county; and that the acts of the county were ultra vires resulting in debts and obligations illegally

incurred and the application and disposition of public funds produced by taxation contrary to law to the prejudice and irreparable damage of all the taxpayers of the county. The answer of appellee was an admission that it is a county of Nebraska, and a general denial.

The appellee leased about 50 acres of land for 5 years commencing with June 1, 1947, for the sole purpose of removing rock therefrom with the right of ingress and egress to and from it, and the right to locate, use, and operate thereon a rock crusher and other appropriate machinery, equipment, and materials to engage in quarry, blasting, and crushing of rock without liability for damages to the lessor caused by the operations of appellee thereon.

Appellee purchased and used in its operations of removing, crushing, and transporting crushed rock a two-unit rock crusher, a Euclid rock truck, three Ford dump trucks, one Lorain and one General shovel with three-quarter yard buckets, two air compressors, water pump, bulldozer, Keystone well drill, jack hammers, and twelve trucks to transport the crushed rock produced by it.

The county engineer stated that during the year 1948, appellee produced 66,842 1/12 cubic yards of crushed rock, sold and delivered 14,241⅓ cubic yards to the general public at the quarry or stock pile for $1.50 a cubic yard, and placed on the surface of the county roads and Schroeder mail routes in the county and stock-piled the part produced and not sold to the public. During the year 1949, the crushed rock produced was 91,856 1/12 cubic yards, of which 11,994 7/12 cubic yards were sold to the general public for $1.50 a cubic yard, and the balance was used to surface roads in the county and for stock pile. The total crushed rock sold in these years, according to this evidence, was 26,235 11/12 cubic yards.

The county treasurer, who kept the records and collected and accounted for the proceeds of the sales, testified that the amount of crushed rock sold by the coun-

ty from April 1948, to January 1, 1950, was 39,525½ cubic yards for $1.50 a cubic yard. The proceeds from the sales were placed in a separate fund designated "crushed rock fund." Sales were made to purchasers from York, Lancaster, Johnson, Jefferson, and Seward counties. The county engineer had supervision of approving claims for the wages of employees, expenses of operating the rock quarry, and rental payments on the lease—five cents a cubic yard. These claims were paid out of the special rock fund. The amount of crushed rock stock-piled was no more definitely disclosed than the estimate that it was sometimes as much as six or seven thousand yards, and that of the amount produced in 1949, only 3,693½ yards were "left in stock pile."

The crusher owned by the county was rated at 120 yards an hour, but the maximum it produced was 100 yards an hour. The average daily production was from 700 to 800 cubic yards a day. The miles of road surfaced with rock in 1948 did not exceed 150, and in 1949, 168 miles, or a total of 318 miles. All of the roads for which the county is responsible have not been surfaced with rock. The quarry may become exhausted or the cost of using the available rock shelves therein may become prohibitive within another year or so. Search for another quarry site has already been made without success.

There is no record of any action of the county board authorizing the county or its employees' to sell crushed rock. The county clerk stated he had not been in any meeting of the board when that subject was mentioned, and "The board has never discussed going in the open market and selling rock." A member of the board testified the matter of selling rock was authorized by the board talking it over and advising the engineer and treasurer to accept money for that purpose, but nothing was placed on the books of the commissioners concerning the sale of rock. He said the taking care of the roads of the county was first, and if there was any surplus

left over by continuous operation it could be sold and the price of $1.50 a cubic yard was determined by "jockeying around among ourselves"; that it is like any other business—"we have got to have a little profit, we don't dare show a loss." The engineer was told by the board to sell crushed rock to individuals when there was a surplus, and the decision of when sales should be made was left up to the engineer.

Appellee had twelve trucks to transport rock from where it was produced and crushed to where it was put on the roads, but their capacity was not sufficient to move all the rock produced. There were times when the surfacing of roads was discontinued on account of weather conditions, operating difficulties, and similar causes, and because of these facts the rock was placed in a stock pile. The sales of rock during periods of production did not deplete the stock pile. When production was discontinued, no sales were made, but refusal of sale or delivery of rock to any purchaser is not established. The needs of the county for crushed rock exceed the production. All the roads available to be surfaced with rock have not been surfaced.

A county in this state is a creature of statute and has no inherent authority. It has only such powers as are expressly conferred upon it by statute, and such as are incidentally indispensable to carry into effect those expressly granted it. A grant of power to a county is strictly construed, and any fair and reasonable doubt of the existence of the power is resolved against the county. Speer v. Kratzenstein, 143 Neb. 300, 9 N. W. 2d 306; Cheney v. County Board of Supervisors, 123 Neb. 624, 243 N. W. 881; Lindburg v. Bennett, 117 Neb. 66, 219 N. W. 851; State ex rel. Grady v. Board of County Commissioners, 18 Neb. 283, 25 N. W. 91.

The powers of a county are authorized and required to be exercised by the county board. § 23-103, R. S. 1943. County boards have supervision over the public roads of the county and the duty to see that the laws re-

lating to them are carried into effect. § 39-103, R. S. 1943. The duty of maintenance and repair of county roads, including suitable and adequate machinery, tools, appliances, and materials necessary for the efficient maintenance, and repair of the roads, is enjoined upon county boards. §§ 39-230 and 39-232, R. S. 1943. This responsibility was in 1947 enlarged to include rural mail and star mail route roads. §§ 39-1001 to 39-1009, R. S. Supp., 1949.

The powers of a county board in this regard are commensurate with the duty and responsibility imposed upon it, and their performance in any reasonable manner adopted by it will not be interfered with. Gage County had power to contract for a supply of stone and to provide means for processing it for use in surfacing and resurfacing county roads and mail route roads and placing the material on such roads. Cheney v. County Board of Supervisors, *supra;* Annotation, 104 A. L. R. 1342.

Appellee processed stone for the purpose of putting and keeping its public roads in proper and satisfactory condition. It claims the efficient management and operation of its quarry required as constant and continuous operation as possible to avoid excessive cost and to enable it to secure and have skilled labor and truckers. It asserts this resulted incidentally in a quantity of crushed stone in excess of the amount it could immediately transport to and deposit on the roads, and the amount prudently required for placing and having in a stock pile. It was this amount, designated by it as excess or surplus, that it sold to anyone, individual or corporate, who desired to purchase rock. This so-called excess or surplus rock was to some extent produced during each period of operation of the quarry. The sale of rock was profitable. The charge was $1.50 a cubic yard, and the cubic yard cost in 1948 was $.99½, and in 1949 was $.86½.

The explanation by appellee of the reason for selling rock is an easy one without concrete facts to support

it, but it is not entirely convincing. The total crushed rock produced by it in 1949, as told by its engineer, exceeded by more than 25,000 cubic yards the amount produced in 1948, but the amount sold in 1949 was more than 2,000 cubic yards less than the quantity sold in 1948. The increased production in 1949 was nearly twice as much as the quantity sold in 1948, and more than double the quantity sold in 1949. It may be at least speculated that the challenge of the right of the county to sell stone by the commencement of this litigation in December 1948, had something to do with the ease with which the county handled the increased production in 1949, notwithstanding the decreased sales that year. In any event, the greatly increased quantity of stone was disposed of by the county without material difficulty or a point of it would surely have been made at the trial of this case. These facts mildly indicate more than an incidental desire and a fixed determination to sell rock.

The legality of the sales by appellee is not sustained by any direct or decisive adjudication or text. Appellee appeals to the doctrine applicable, with limitations, to a municipal corporation that it may, when authorized by law to engage in the business of furnishing services to its inhabitants, sell or furnish a surplus necessarily acquired to persons residing without or within the municipality, though not expressly authorized to do so by charter or a statute, but subject to the prior rights of its inhabitants. Carroll v. City of Cedar Falls, 221 Iowa 277, 261 N. W. 652; 38 Am. Jur., Municipal Corporations, § 570, p. 258; Dillon, Municipal Corporations (5th ed.), § 1300, p. 2124; McQuillin, Municipal Corporations (3d ed.), § 35.34, p. 667. There is much support of this doctrine, but the thing disposed of by virtue thereof must be surplus in fact and reasonably produced by a municipal corporation in its business or proprietary capacity, and it is generally limited to such commodities as water, electric current, and like commodities. A persistent search has failed to locate any decision of a court

or any observation of a law writer that has ascribed applicability of this doctrine to a county or any political subdivision of like character. Appellee does not suggest or claim that there is such authority.

It is said in Hyre v. Brown, 102 W. Va. 505, 135 S. E. 656, 49 A L. R. 1230, that: "The implied power of municipalities which operate electric lighting and power plants and water works, to sell light, power, heat and water for private purposes, is based on a surplus of the commodity on hand, and that the sale of that surplus will not impair the main purpose. * * * A city in furnishing such commodities acts in its proprietary or business capacity as distinguished from its governmental functions and powers. * * * It will be observed that these decisions that it may do so are based largely on the proposition of an excess of the commodity beyond the use of the city's needs; and having such surplus, it would be for the general corporate welfare to dispose of it in order to keep up the plant and reduce taxation. One of the cases naively says that the city may make 'two blades of grass grow where one formerly grew.' In the case at bar there is no suggestion of surplus electricity on hand."

A municipal corporation authorized to own and operate a utility is treated as a private corporation engaged in a purely business enterprise, as separate and distinct from the performance of its governmental functions and corporate duties as if it were not a municipal corporation at all. In Nelson-Johnston & Doudna v. Metropolitan Utilities District, 137 Neb. 871, 291 N. W. 558, it is said: "The authority given a municipality to engage in the operation of a business enterprise carries with it the power to conduct it in the same manner in which a private corporation would deal with its property under similar circumstances."

Appellee is not a municipal corporation. A county in this state is a quasi corporation, governmental in character only, charged with certain objects of necessary

local administration, and in that capacity acts purely as an agent of the state. It does not possess the double governmental and private or proprietary character that cities do. State ex rel. City of Omaha v. Board of County Commissioners, 109 Neb. 35, 189 N. W. 639; Lindburg v. Bennett, *supra;* State v. Cheyenne County, 127 Neb. 619, 256 N. W. 67; Ahern v. Richardson County, 127 Neb. 659, 256 N. W. 515.

Appellee refers to numerous cases to sustain the rule that a municipal corporation may dispose of its surplus products, whatever the character of the products may be—electricity, water, or even unused space in a public building. It then argues that if a city may build in anticipation of future needs or lease premises which it owns and not then capable of immediate use by the city to obtain an income therefrom, or if a city can build to supply power load during certain hours or certain seasons and as a result thereof have a surplus it may dispose of in the market, that since appellee has developed a plant capable of producing a commodity in excess as it claims of its immediate needs, it is authorized and should be permitted also to sell in the market what it decides is the surplus or excess, notwithstanding the supply it produces has not equaled requirements of the roads of the county for which the commodity is produced, and notwithstanding the obvious fact that the product is not perishable but durable and capable of being retained indefinitely without depreciation or loss. It may properly be remarked here, as it has been before stated, that the rule relied on is born of the facts in the particular case. The facts are not born of, neither can they demand as of right that they be adopted by, the rule.

This case concerns a durable material not capable of deterioration, and no surplus rock incidentally produced required private sale as is frequently true in a municipal supply of water, electric energy, or a like commodity. This record fails to show in any proper or legal sense

any surplus of rock produced by appellee. In City of Los Angeles v. Lewis, 175 Cal. 777, 167 P. 390, the validity of a statute was involved which authorized the board of supervisors of any county in the state to purchase, acquire, or lease a cement manufacturing plant and to sell the products of the same in such manner and upon such terms and conditions as they should deem proper. The county of Los Angeles leased and was engaged in operating a cement manufacturing plant. Litigation resulted involving the legality of the actions of the county and the validity of the law. In an attempt to sustain both it was argued that the legislative enactment should be construed as authorizing the county to acquire or lease a cement plant and to use its products solely for the public purposes of the county with power to sell cement, limited to "the surplus cement incidentally produced." The court in disposing of this contention said: "Moreover, from the nature of that product itself, there could be, if force be given to respondents' construction of the act, no 'surplus cement incidentally produced' demanding private sale, as is not infrequently the case in the public supply of water or hydro-electric energy. Portland cement is a product which can be carried over without deterioration. The necessary products for the needs of a county for a given year can unquestionably be closely estimated in advance by the county authorities. Their factory can, therefore, manufacture that amount and no more. But if there should chance to be an incidental surplus, the exigencies of the situation do not demand that that surplus should be sold, since it may safely and economically be carried over for next year's consumption. The theory, therefore, of a surplus 'incidentally produced' is as wholly without reason as it is wholly without the purview of the law under review * * *."

What has been said herein is not that a county of the State of Nebraska may not sell or lease property owned by it under proper circumstances. A county has such right and power. § 23-104, R. S. 1943. The selling

of crushed rock produced by appellee under the circumstances of this case is not within the authority granted to sell property owned by a county.

The judgment herein should be and is reversed and the cause is remanded with directions to the district court to enter a judgment enjoining appellee from selling crushed rock produced and owned by it.

REVERSED AND REMANDED WITH DIRECTIONS.