## JOHN WRIGHT & ASSOCIATES, INC. v. CITY OF RED WING AND OTHERS.

93 N. W. (2d) 660.

November 28, 1958—No. 37,501.

2

*Fryberger, Townsend & Ewing,* for appellant.

*Charles Richardson,* City Attorney, and *Holst, Erickson, Vogel & Richardson,* for respondents.

MURPHY, JUSTICE.

This action was brought to permanently enjoin the defendants from operating a motion picture theater in the municipal auditorium in the city of Red Wing. Named with the city as defendants are its mayor and members of the city council and five members of "The T. B. Sheldon Auditorium Board." The plaintiff is a taxpayer and a competing motion picture operator in Red Wing. The appeal is from a judgment entered pursuant to an order granting summary judgment to the defendants and denying the same to the plaintiffs.

The litigation grows out of the alleged illegal use of auditorium property which was a gift to the city by one Theodore B. Sheldon, who died testate in 1900. By the terms of his will Mr. Sheldon devised to his executors in trust the residue of his estate to be used by them in the "erection, establishment, support or maintenance of any such charitable or other public institution, for any such public use as said Trustees may in their discretion see fit to appropriate or apply the same * * *." The devise contained two limitations: (1) That the residue of his estate be used for the purpose of the trust within a period of 15 years after death, and (2) that it be used for *"some public and beneficient* [sic] *but non-*

*sectarian purpose in the said City of Red Wing."* (Italics supplied.)

Within 15 years after the death of Mr. Sheldon his trustees acquired certain property in the city of Red Wing; erected thereon an auditorium; and installed seats, fixtures, and other equipment. The structure consisted of a large auditorium on the main floor and contained rooms suitable for holding meetings for gatherings of small groups, which might be used while the auditorium was being occupied. Pursuant to the terms of the will, the trustees proposed to convey the auditorium to the city and the city agreed to accept, providing it could get authority from the state legislature to do so. By L. 1903, c. 22, approved March 3, 1903, the state legislature enacted a law enabling the city to accept the proffered gift and provided in § 3 thereof:

"Such property shall for all purposes and so long as the title thereto remains in such city be held to be property owned by such city and used *exclusively for public purposes,* and shall be exempt from taxation." (Italics supplied.)

Subsequently and on October 7, 1904, the city council duly passed a resolution accepting the gift, by which it was provided that the property should be managed and controlled for the use and benefit of the city. As relevant here, the resolution provided that the management of the property should be vested in "The T. B. Sheldon Auditorium Board" to be composed of five resident voters who shall have:

"* * * the general charge of said property and full power and authority to let or lease the same for musical and theatrical entertainments, public meetings, lectures and such other purposes as in their judgment may contribute to the education, enjoyment, improvement or amusement of the people of Red Wing. Such board shall also have exclusive power to fix the rental of said building for such purposes; and may in their discretion grant the use of said Auditorium for any local public purpose or for entertainments of an unusually high character, or for memorial services of the Grand Army of the Republic or for similar societies, or for the exercises or entertainments of the public schools or other institutions of learning, or of any literary, musical, social, or charitable society of Red Wing, or of any political or fraternal organization of said city free or at such reduced rates as they may deem

4

proper."

It is also relevant to our consideration of the issues here to point out that the revenue derived from the property was to be paid to the city treasurer and set apart and kept as a separate fund known as the "Auditorium Fund," said fund to be paid out for such purposes as the board may direct. The board was given the power to use such fund in the repair and maintenance of the property and was authorized to invest accumulated funds derived from the income of the building "in interest-bearing securities as it may deem safe and desirable * * *." The resolution provided for the membership of the first auditorium board and specified that the successors should be appointed by the mayor with the approval of the city council for 5-year terms. The property was to be under the control of both the city council and the auditorium board. The resolution provided that, in case the buildings should be destroyed or "if at any time in the judgment of two-thirds of the City Council and of four-fifths of the then members of the said board" it became advisable to sell the property, it might be sold and the proceeds paid into the Auditorium Fund. In that event the fund was to be used in the erection "of some other public building or institution, or the enlargement or improvement of some then existing public building or institution in the said city of Red Wing" subject to the condition that it be used "exclusively for some public purpose or some charitable or beneficent and not for any sectarian purpose; * * *."

On October 10, 1904, the trustees executed and delivered to the city a deed to the premises, together with all personal property, which deed contained the material provisions as to use and management of the property already recited with reference to provisions contained in the resolution.

Moving pictures have been shown in the auditorium since at least 1912. It is still available for public gatherings and is only used for a theater when such gatherings are not occupying it. The auditorium is self-supporting, with over 90 percent of its income received through motion picture admissions and concessions. It uses no city funds and has received municipal assistance only in the use of free city water. As provided by the ordinance and deed, the proceeds of the venture are

not turned over to the general treasury but are kept in a special "Auditorium Fund."

The plaintiff, operator of the "Chief" motion picture theater of Red Wing, has been in business since 1938. It directly competes with the auditorium enterprise and exhibits moving pictures of the same general character. It pays for the use of city water, social security tax and unemployment compensation for its employees, Federal and state income taxes, annual license fee, and real estate and personal property taxes, all of which amount to roughly $1,750 a year. The trial court in reviewing the pleadings, affidavits, and admissions on file found that:

"By reason of the facts as herein found to exist and that the Auditorium is not compelled to operate at a profit, and, therefore, may, if it wishes, bid higher prices for pictures than plaintiff can afford to bid, and that it has advantage in operating costs by being relieved from the payment of taxes, water, and other impositions, the Auditorium is in a position where it can and does have undue advantage over the plaintiff in plaintiff's operation of the 'Chief' theater, and has advantage over plaintiff as a taxpayer engaged in private enterprise in said City. The plaintiff is thereby damaged and injured, which damage and injury is real and serious."

It is the contention of the plaintiff that the defendants in operating a moving picture business in the auditorium are violating the terms of the will, the ordinance, the deed to the city, and the special act, L. 1903, c. 22. They point out that by the will, ordinance, and deed it is intended that the property shall be used for a "public and beneficent purpose." They point out that by explicit provisions of L. 1903, c. 22, the property is to be used for "public purposes." They argue that this purpose has been perverted by the acts of the defendants in conducting a purely private enterprise in competition with others engaged in the same business in the city of Red Wing.

■ It is clear from the relevant documents relating to the establishment of the auditorium that, while the members of the auditorium board are given authority "to let or lease" the premises, nowhere can there be found language indicating that the municipality, or the auditorium board which is an agency of it, might itself engage in a private business upon

6

the premises. L. 1903, c. 22, which provides that the property shall be used for "public purposes," does not comprehend that a municipality is given authority to use the property for a purpose which is not germane to the objects of the corporation. It is recognized that a municipality may take property in trust for the erection or maintenance of public buildings, monuments, parks, schools, libraries, etc. 63 C. J. S., Municipal Corporations, § 960. There is authority to the effect that a municipal corporation may gratuitously or for compensation permit buildings erected for municipal purposes to be used incidentally for a lawful private purpose which will not interfere with public use. In Anderson v. City of Montevideo, 137 Minn. 179, 162 N. W. 1073, an action was brought to enjoin the city from leasing the auditorium in a tax-built municipal building for a moving picture theater. The auditorium was no longer needed for municipal purposes, and such rental benefited the city treasury. The city of Montevideo was allowed to rent its auditorium built with tax funds to a private person for the purpose of showing moving picture shows. See, 64 C. J. S., Municipal Corporations, §§ 1808, 1809; 38 Am. Jur., Municipal Corporations, §§ 489, 562. We find no authority, however, to the effect that a municipality, or an agency or board of a municipality, may itself engage in a private business on municipal property, even though such property has been acquired by devise or gift. A municipal corporation or its agency is invested with full power to do everything necessarily incident to the proper discharge of its public functions. In the absence of express legislative authority, it may not engage in any private business enterprise or occupation such as is usually pursued by private individuals. 12 McQuillin, Municipal Corporations (3 ed.) § 36.02; Nerlien v. Village of Brooten, 94 Minn. 361, 102 N. W. 867. Discussing an issue with reference to expenditures for a "public purpose," we said in Visina v. Freeman, 252 Minn. 177, 184, 89 N. W. (2d) 635, 643:

"* * * What is a 'public purpose' that will justify the expenditure of public money is not capable of a precise definition, but the courts generally construe it to mean such an activity as will serve as a benefit to the community as a body and which, at the same time, *is directly related to the functions of government.*" (Italics supplied.)

The most persuasive authority on the issue is that of State ex rel. Smith v. City of Hiawatha, 127 Kan. 183, 184, 272 P. 113, a case involving an action to enjoin the city and the trustees of its auditorium from carrying on a picture show business in a memorial auditorium which had been built and maintained at public expense, where it was said:

"* * * A moving-picture show is a well-recognized kind of private business, carried on by private parties in most of the cities, towns and community centers of the state."

We agree that the operation of a moving picture theater is a well-recognized competitive and commercial business comparable to grocery or clothing businesses. We find no authority which permits the operation of said business by the city of Red Wing or by its auditorium board.

We think that the authority of Starlight Corp. v. City of Miami Beach (Fla.) 57 So. (2d) 6, may be distinguished. There, suit was brought against the city of Miami Beach on the ground that it was beyond the charter power of the city to operate a theatrical or amusement business in competition with plaintiff's privately owned business. There the court held that the city, under statutory authority to construct an auditorium, had implied authority to operate the auditorium in behalf of the public interest or the economic welfare of the city, even though such operation was in competition with the plaintiff's business. The Florida court construed the statute authorizing the construction of the auditorium as indicating that the legislature intended that it was designed to accommodate winter visitors to the area. It said that (57 So. [2d] 8) "visitors to Miami Beach during the winter months are an important business and materially affect the economic life of that community." The decision infers that the power to own the particular type of auditorium there involved carried with it the power and authority to operate it in behalf of the public interest. We have no such situation here.

It may be argued that we misconceive the issue by failing to distinguish between the limited power of the municipality and the asserted broader right of the auditorium board to conduct the motion picture business. It seems clear to us, however, that the city, which owns the building, and the authority, which has charge of its management, are both controlled by the requirement of L. 1903, c. 22, that the premises must be

operated for "public purposes." It cannot be seriously argued that the operation of a motion picture business is a public purpose.

■ The defendants point out that the moving picture theater has been conducted in the auditorium since 1912 and contend that, even though the purpose may not be a public one, yet by some prescriptive right derived through the passage of time or through laches or acquiescence which constitutes an equitable estoppel the activity has now become legal. We find no authority to support this contention. The operation of a private business upon the premises was never contemplated by the testator nor authorized by the legislature. The business was unauthorized from its inception. Nor can we see that the discontinuance of the business of operating a movie by the city and the auditorium board upon public property will result in oppressive or unfair consequences to the defendants. It is clear that the operation of the moving picture business by the defendants is not a profitable venture although it has been successful in years past. The record contains figures with reference to receipts and disbursements for the years 1951 to 1956, inclusive, which show that, while there was a profit in 1951 of $308.65, there was a loss in 1956 of $906.27. Losses in the intervening years were substantially greater.[1] The auditorium board in 1951 held investments

[1]"RECEIPTS (1)

| | 1951 | 1952 | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|---|---|
| Motion pictures | $47,690.55 | $40,456.18 | $40,327.84 | $42,708.98 | **$38,786.44** | **$43,815.71** |
| Stage Shows | 1,788.58 | 2,395.95 | 2,163.10 | 1,110.90 | 1,165.60 | 899.45 |
| Others | 18.86 | 8.00 | 474.66 | 1,156.16 | 463.91 | ..... |
| Concessions | ..... | ..... | ..... | ..... | 1,969.17 | 7,481.50 |
| | $49,497.99 | $42,860.13 | $42,965.60 | $44,976.04 | $42,385.12 | $52,196.66 |
| Disbursements (2) | 48,989.34 | 45,158.45 | 46,757.72 | 49,394.17 | 47,590.91 | 53,102.93 |
| Profit or Loss ( ) | 308.65 | (2,298.32) | (3,792.12) | (4,418.13) | (5,124.79) | (906.27) |
| Per Cent of Income From Motion Picture Admissions | 96% | 94% | 92% | 94% | 91% | 82% |
| Per Cent of Income from Concessions | ..... | ..... | ..... | ..... | .04% | .14% |
| Total Assets (3) | 259,632.62 | 255,501.37 | 252,386.72 | 247,391.87 | 240,504.76 | ..... |
| Investments (4) | 135,888.65 | 137,876.00 | 128,103.76 | 113,307.95 | 110,219.61 | ..... |

(1) Does not include interest from invested surplus
(2) Does not include depreciation
(3) & (4)—include depreciation"

in the total sum of $135,888.65. This sum has been depleted through the years to the point where in 1955 the total investments were $110,219.61. We find nothing in the record which would justify the continuance of the business by the city of Red Wing.

■ It is the further contention of the defendants that the plaintiff is without standing to bring this action. This argument may be briefly disposed of by pointing out that, where a municipal corporation or one of its agencies engages in a business activity in excess of its authorized powers, a taxpayer engaged in a competing private business who is adversely affected by the activity has standing to challenge the legality of such action. See, Starlight Corp. v. City of Miami Beach (Fla.) 57 So. (2d) 6; City of Cleveland v. Ruple, 130 Ohio St. 465, 200 N. E. 507, 103 A. L. R. 853. The record establishes that the plaintiff's gross income is lessened because of the division of patrons between its theater and the municipal auditorium, as a result of which it has been damaged. Such injury is sufficient to establish standing in the plaintiff as a taxpayer on an allegation of ultra vires municipal activity. This holding is substantiated by Nerlien v. Village of Brooten, 94 Minn. 361, 102 N. W. 867, which involved a suit to enjoin the defendant village from aiding a private citizen who was permitted the free use of the village hall in his business. The plaintiff was a taxpayer and competitor. The court held that a person owning property in the municipality whose business was injured by the act of the municipality may properly object and that the taxpayer and property owner was entitled to an injunction to restrain the unlawful use of public property, the effect of which was to cause him damage. We hold that the plaintiff here, being a property owner and taxpayer whose business is injured by the activity conducted by the city, is entitled to an injunction preventing the continued unauthorized business.[2]

---

[2]For additional facts reference may be made to Longcor v. City of Red Wing, 206 Minn. 627, 289 N. W. 570, which involved an action brought by a citizen and taxpayer of the city of Red Wing to recover the sum of $54,000 which he alleged had been illegally diverted from the "auditorium fund" by the city and members of the auditorium board. We held there that the attorney general was the proper party plaintiff to compel compliance with the conditions impressed upon the gift to the city and that a citizen

The judgment of the trial court is reversed and the matter is remanded to the district court with directions to enter judgment for the plaintiff upon such conditions as the court may direct, having in mind that the time when the injunction shall take effect may be extended to permit the city and the auditorium board to adjust and terminate current contractual commitments in connection with the operation of the unauthorized business.

Reversed and remanded.

and taxpayer who sues on his own behalf and on behalf of all of the beneficiaries of the "will and the charity" could not maintain the action. We do not conceive that the holding in that case has any bearing on the issues before us.