# MARVIN F. BORGELT AND ANOTHER v. CITY OF MINNEAPOLIS AND OTHERS.

135 N. W. (2d) 438.

May 21, 1965—No. 39,556.

*Mandt Torrison* and *Bundlie, Kelley & Torrison,* for appellants.
*Keith M. Stidd,* City Attorney, and *D. J. Shama* and *LeRoy W. Jackson,* Assistant City Attorneys, for respondents.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order denying plaintiffs' motion for a new trial.

The city of Minneapolis is a city of the first class governed by a home rule charter. Plaintiff Marvin F. Borgelt is a resident and taxpayer of the city of Minneapolis who operates asphalt mixing plants at Inver Grove and Red Wing, Minnesota. Plaintiff intervenor, J. V. Gleason, is a resident and taxpayer of the city of Minneapolis and operates an asphalt mixing plant in St. Louis Park.

For many years the city of Minneapolis has owned and operated two asphalt plants, one since 1927 and the other since 1932, for the mixing and manufacturing of several types of asphalt mix used in the paving, care, and maintenance of the streets of the city. It has on rare occasions sold insignificant amounts of asphalt to others. Until 1943 there were no private asphalt plants in operation from which the city could procure the necessary mix. Since 1943, however, 24 private asphalt plants have commenced operation in the Minneapolis area, and at least some of these plants produce a grade of asphalt mix which Minneapolis requires, and they would like to sell their product to Minneapolis if the locations where it was used were right.

The two existing city plants are a 2,000-pound-batch plant and a 4,000-pound-batch plant which can produce about 125,000 tons of mixed asphalt annually. The city has used less than 100,000 tons each year with the exception of a period of 2 or 3 years when streetcars

were converted to buses for mass transportation and streetcar rails were covered with asphalt paving. The private plants now in operation have produced 1,000,000 tons of asphalt mix annually but have a capacity of almost 2,500,000 tons.

An asphalt plant is subject to hard usage and requires yearly overhauls and much maintenance and repair. One of the engineers who testified stated that in his opinion the lifetime production capacity of a plant normally would be 2,000,000 tons.

The Minneapolis plants have become outmoded and overhauling could not modernize them sufficiently to bring them up to the standards of a new plant. During the years 1956 through 1963 the city has expended for material, repair, and capital outlay to maintain its two asphalt plants the sum of $366,271, and the court found, based on evidence in the record, that if the plants are to continue in operation it will be necessary for the city to expend $20,000 to $30,000 annually for their repair, maintenance, and upkeep. Even then, they would not be brought up to the efficiency of a new plant.

The city had under consideration for some time the establishment and operation of a new and modern asphalt plant. An investigation was made into the matter and the city engineer instructed to prepare plans and specifications, which he did. The plans and specifications were duly approved and adopted by the city council, and bids were advertised and received according to law. On January 31, 1964, the city council accepted bids for part of such plant, the final cost of which probably will exceed $650,000.

It is the claim of plaintiffs (1) that the proposed construction of the new plant was not submitted to the city planning commission; (2) that no provision was made in the 1964 budget for the construction of the plant; (3) that no appropriation was included in the appropriation resolution for 1964 approved by the council in 1963; (4) that the city of Minneapolis does not have power to construct a new asphalt plant; (5) that the decision of the city to construct such plant was arbitrary, unreasonable, capricious, and an unlawful waste of taxpayers' money.

This action was brought to restrain the city from proceeding with the establishment of the new plant.

The trial court found against the contentions of plaintiffs and also that they were barred by laches from questioning the acquisition of the new plant because they had permitted the old plants to continue in operation over a long period of years without objection.

■ At the outset, it is clear that a municipal corporation has only such powers as are expressly conferred upon it by statute or its charter, or necessarily implied. It has no inherent power. Tousley v. Leach, 180 Minn. 293, 230 N. W. 788; State ex rel. Village of Fridley v. City of Columbia Heights, 237 Minn. 124, 53 N. W. (2d) 831; Village of Brooklyn Center v. Rippen, 255 Minn. 334, 96 N. W. (2d) 585; 13A Dunnell, Dig. (3 ed.) § 6684; 2 McQuillin, Municipal Corporations (3 ed.) § 10.09. As to the extent of the implied powers of a city or municipal corporation, we pointed out in Tousley v. Leach, *supra,* that the trend is toward a less restrictive rule than we followed in our early cases, and the tendency now is to uphold the power that is a necessary aid to a specific grant in the statute or charter. In that case we held that payment of expenses of Minneapolis aldermen who had attended a meeting of an asphalt association in New Orleans was permitted under the provisions of the city charter giving the city council "the care, supervision and control of all highways, streets, alleys, public squares and grounds," and authorizing it "to cause to be paved, repaved or macadamized any street or alley." 180 Minn. 294, 230 N. W. 789.

With respect to the function of the court in reviewing the exercise of a power claimed to be implied from the statute or charter, we said in the Tousley case (180 Minn. 296, 230 N. W. 789):

"If the purpose is a public one for which tax money may be used, and there is authority to make the expenditure, and the use is genuine as distinguished from a subterfuge or something farcical, there is nothing for the court. Whether there shall be such use is then one of policy for the legislature. The trial court finds that there was a public use and purpose. After a thorough consideration its view is that all was in good faith and that substantial beneficial results came to the city. Its position on this point is definite and positive."

We concluded that the trial court was justified in denying injunctive relief.

An examination of the statutes leads to the conclusion that there is no express authority to be found for the operation of an asphalt plant. Some effort has been made to justify it under Minn. St. 452.01, subd. 3, which provides for the ownership and operation of public utilities. We think it is quite clear that an asphalt plant used only for the preparation of material used by the city itself is not a public utility.

Nor is there any express authority in the city charter. Authority then, if there is any, must be found in the implied powers of the city. The charter of the city contains the following provisions which are pertinent here. Minneapolis City Charter, c. 8, § 1, provides:

"The City Council shall have the care, supervision and control of all highways, streets, alleys, public squares and grounds within the limits of the city, and may lay out and open new streets and alleys, and extend, widen and straighten any that now exist, or which may hereafter exist; * * *."

Chapter 8, § 11, provides:

"The City Council is hereby authorized in its discretion to cause to be paved, repaved or macadamized any street or alley or any part thereof in the city, * * *."

Chapter 8, § 5, provides in part:

"All work done or constructions made of any kind by the said City of Minneapolis, may be done by contract awarded in such manner as the City Council of said city may deem advisable, or said City Council may, in its discretion, direct any such work or construction or any part thereof which it shall deem necessary to be made to be done by day's work under the direction of the said City Council, or any officers of said city whom the said City Council may designate."

Thus, it is clear that these charter provisions authorize the city to pave or repair streets and alleys either by letting the work on contract or by doing it by "day's work."

In order to pave or repair by daywork, it is essential to procure the

necessary material to complete the job. Prior to 1943 there were no private asphalt plants. If the work was to be done at all, the city had to provide its own material. No one seems to question the fact that up to the time when material became available from private concerns the city had implied power to operate its own plants in order that material would be available. The question now before us is whether the city has lost the right to own and operate its own plant after asphalt mix became available from private plants.

Preparing the asphalt mix is only one step in the overall job of repairing or paving city streets. Inasmuch as the city is given authority in its charter to do this work by day labor, as distinguished from letting it on contracts, it would seem that the charter provision applies to one phase of the work as well as to the other. Preparing the asphalt mix is an integral part of the overall job. The same argument could be made that the city has no authority to own its trucks to haul the mix or to hire day labor to lay it as is made against its preparing its own aggregate. If it can do one part of the job, it ought to be permitted to do all of it.

We have no case law directly in point in Minnesota. Cases from other jurisdictions are not in harmony. In Schneider v. City of Menasha, 118 Wis. 298, 95 N. W. 94, it was held that the power to purchase and operate a quarry was implied from express authority to grade and pave streets and from power to purchase and hold real estate for public convenience and necessity. In People ex rel. Sweitzer v. City of Chicago, 363 Ill. 409, 2 N. E. (2d) 330, 104 A. L. R. 1335, the court held that power to operate a tree nursery was implied from the express power of a city to operate and maintain parks. In State ex rel. Johnson v. County of Gage, 154 Neb. 822, 49 N. W. (2d) 672, the court held that the county did not have implied power to sell stone taken from a quarry to others, apparently implying that it could operate the quarry for its own use. In Colwell v. City of Waterbury, 74 Conn. 568, 51 A. 530, 57 L. R. A. 218, it seems that the city's power to operate a stonecrusher was assumed without further discussion.

On the other hand, in Duncan v. City of Lynchburg, 2 Va. Dec.

700, 703, 34 S. E. 964, 965, 48 L. R. A. 331, the court held that a city charter granting power to "purchase, hold, sell, and convey all real and personal property necessary for its uses and purposes" did not grant the city power to operate a quarry. See, also, Donable's Administrator v. Town of Harrisonburg, 104 Va. 533, 52 S. E. 174, 2 L. R. A. (N.S.) 910, and City of Radford v. Clark, 113 Va. 199, 73 S. E. 571, 38 L. R. A. (N.S.) 281.

Main reliance is placed by plaintiffs on Attorney General v. Detroit Common Council, 150 Mich. 310, 113 N. W. 1107. In that case the court found that the city of Detroit did not have the power to construct a municipal plant for manufacturing bricks to be used on its city streets. It is undoubtedly the strongest case favoring plaintiffs' position. The court said (150 Mich. 311, 113 N. W. 1107):

"* * * While the law permits municipal corporations to do those things which are necessary to accomplish the objects of their creation, under an implication of power * * *, the right has not usually been held to go so far as to permit them to engage in the manufacture of articles necessary to their lawful enterprises, where they are in common use and are to be had in the open market."

An essential consideration in determining whether the city has the authority to engage in the activity which plaintiffs seek to restrain is whether the city's money is being spent for a public purpose. In Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635, we discussed the question of what is a public purpose. It is not easy to define. We there said (252 Minn. 184, 89 N. W. [2d] 643):

"It is well settled in this state that the state or its municipal subdivisions or agencies may expend public money only for a public purpose. What is a 'public purpose' that will justify the expenditure of public money is not capable of a precise definition, but the courts generally construe it to mean such an activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government."

We have no difficulty finding that building, repair, or maintenance of streets encompasses a public purpose. The restraint on spending

public money must then be based upon some limitation on the power to spend public money for public purposes.

It is not easy to define precisely what a municipal corporation may or may not do under its implied powers. At one extreme are those activities, clearly outside the performance of municipal functions, which will be restrained. Such is the case of John Wright & Associates, Inc. v. City of Red Wing, 254 Minn. 1, 93 N. W. (2d) 660, where we held that the operation of a moving picture theater was not a legitimate municipal function. With respect to implied authority we there said (254 Minn. 6, 93 N. W. [2d] 664):

"* * * A municipal corporation or its agency is invested with full power to do everything necessarily incident to the proper discharge of its public functions. In the absence of express legislative authority, it may not engage in any private business enterprise or occupation such as is usually pursued by private individuals."

At the other extreme are those activities which are clearly necessary for, or aid, performance of a municipal function. We believe that owning and operating an asphalt plant prior to 1943 would fall into this category, for during that period if the city was to obtain this type of material for its street improvement or repair it was essential that it furnish it to itself.

Between these two extremes lies a gray area where it may be desirable, but not necessary, to engage in the proposed activity. Such is the case of Central Lbr. Co. v. City of Waseca, 152 Minn. 201, 188 N. W. 275. The present case probably falls within that area. While the city points to advantages accruing to it from owning and operating its own mixing plant, and there undoubtedly are many, plaintiffs with equal logic point to reasons why the city should not spend large sums of public funds for this purpose as long as the material is available from private sources.

One of the main factors in determining whether a city should enter into an activity such as this is whether the city is in active competition with private enterprise. 12 McQuillin, Municipal Corporations (3 ed.) § 36.02. John Wright & Associates, Inc. v. City of Red Wing, supra, illustrates the type of case in which competition with a private

enterprise was considered an important factor in holding that the city was not permitted to engage in that activity. There are, however, municipal activities that are permissible even though private enterprise could furnish the same service. As long as the city refrains from extending its activity into active competition with private enterprise *in dealing with others,* it should be allowed considerable latitude in providing for itself those things necessary to carry on a legitimate municipal function if there are valid reasons for becoming a self-supplier. Preparing its own asphalt material; mixing its own cement; digging its own gravel; preparing crushed rock; and other similar activities incidental to street work, we think, fall within such permitted activity. Here, there is no direct competition with private enterprise in the true sense of the word. The only competition, if there is any, is a denial of the opportunity to furnish the city its requirements. In Porto Rico Ry. Light & Power Co. v. Colom (1 Cir.) 106 F. (2d) 345, 353, the court said:

"* * * Furnishing services to oneself does not constitute competition, as that term is generally accepted, and furnishing power as contemplated for the insular government and the municipal purposes, is in effect a case of the insular government supplying itself."

The trial court in the instant case, in a helpful memorandum, has aptly stated this idea as follows:

"* * * The private companies never had the City for a market. Nor will they, if the City continues operation of its present plants. The building of a new plant, therefore, should not be regarded as competitive with private business."

If the operation of an asphalt plant prior to 1943 constituted a public purpose, it is such after 1943, regardless of the fact that others have seen fit to manufacture and furnish the same kind of material to other consumers. It would also seem that if repair, maintenance, and operation of the existing plant would encompass a public purpose, acquisition of a new plant performing more efficiently the same function is likewise a public purpose.

We think, therefore, that owning and operating its own asphalt mixing plant for the purpose of supplying itself material for the building

or repairing and maintenance of its own streets is a legitimate public purpose and may be implied from the authority of the city to build and maintain streets, as long as it does not attempt to sell its product to others except to the extent permitted by Minn. St. 160.11, subd. 2.

■ It appears from the record that the city maintains certain streets that are trunk highways, state-aid roads under contract with the state, and so-called county-aid roads under contract with the county. While plaintiffs apparently do not seriously urge that there is any difference in the authority of the city to mix its own material for the maintenance of such streets, it might be said that we see no reason why the city, in the performance of such contracts, could not supply the street-building material for such streets the same as for its own streets. Here, again, supplying the material is only incidental to the performance of the total job and only a part thereof. If the city can do the rest of the work, it ought to be able to supply itself with the necessary material.

Apparently that is what the legislature had in mind in enacting that part of L. 1959, c. 500, now coded as Minn. St. 160.01 and 160.11. Section 160.01 reads:

"Subdivision 1. For the purposes of chapters 160 through 165 the roads of this state shall be designated and referred to as trunk highways, county state-aid highways, municipal state-aid streets, county highways, and town roads. They shall be established, located, constructed, reconstructed, improved, and maintained as provided in chapters 160 through 165 and acts amendatory thereto.

"Subd. 2. The provisions of chapters 160 through 165 do not relate to highways or streets established by, or under the complete jurisdiction of cities, villages, and boroughs except when the provisions refer specifically to such highways or streets."

Section 160.11 so far as applicable provides:

"Subdivision 1. When any county board, town board, or council of any village or city shall deem it necessary for the purpose of building or repairing public roads or streets within its jurisdiction, it may procure by purchase, gift, or condemnation in the manner provided by law any lands within the state containing any materials suitable for

road purposes, together with the right of way to the same of sufficient width to allow teams, trucks, or other vehicles to pass, and on the most practicable route to the nearest public road.

"Subd. 2. The county board, town board or council of *any city* or village *may engage in the processing of crushed rock or other road building material* for use on public roads or streets within their respective jurisdictions; and may by agreement sell to any other county board, town board, city or village council any sand, rock, crushed rock, gravel, or other earth material suitable for road purposes, upon terms and conditions as may be mutually agreed upon by the parties." (Italics supplied.)

While § 160.01, subd. 2, excludes "highways or streets established by, or under the complete jurisdiction of cities, villages, and boroughs except when the provisions refer specifically to such highways or streets," the chapter does apply to trunk highways, county state-aid highways, municipal state-aid streets, county highways, and town roads, and as to those roads *any city* has the right to process crushed rock *or other road-building material.* It would seem that the term "processing of crushed rock or other road building material for use on public roads or streets within their respective jurisdictions" includes mixing asphalt with rock or gravel to form road-building material just as much as it might include mixing concrete. It follows that, inasmuch as authority is to be found here for processing such material for use on roads defined in the statute, implied power on the part of the city to do the same on its own streets may easily be found under the charter provisions giving it the authority and the duty of maintaining its streets.

An asphalt mixing plant consists of portable personal property. It is really several separate units which, operating together, make up the entire plant. Except as to size and cost, there is little legal difference between the acquisition of such a plant and the acquisition of a truck or cement mixer or any other piece of equipment essential for the performance of street work. All are or may be necessary and incidental parts of the equipment necessary for the completion of a street-paving job or for repair and maintenance of the city streets. Inasmuch as the city has express authority to do such maintenance or paving by day-

work, the right to acquire the necessary equipment to carry out the task must necessarily be implied from the right to do the work in the first place.

■ The trial court found that plaintiffs were guilty of laches in permitting the city to continue operation of its two existing plants over all these years without objection. While it is unnecessary to pass on this issue in the light of our decision that the city had implied authority to acquire the new plant, it might be said in passing that in so far as the acquisition of the new plant is concerned, if a distinction can be drawn between it and operation of the old plant, there has been no delay in seeking to restrain the city from proceeding. It is therefore doubtful that plaintiffs can be held guilty of laches, and we do not place our decision on that ground.

■ Plaintiffs next contend that action of the city ought to be restrained because it is arbitrary, unreasonable, and wasteful. Essentially, it is the claim of plaintiffs that the present plants can be repaired and remodeled for much less money than a new plant will cost.

The wisdom of acquiring a new plant instead of repairing the old one is a matter of policy that ordinarily does not concern the courts if the city is within its legal authority. The trial court found among other things:

"That there is no evidence of any fraud, corruption, or gross abuse of discretion in any of the actions of the City Council of the City of Minneapolis relating to the proposed construction of the asphalt plant.

"That there is no evidence of any irregularity, fraud, or arbitrariness in any of the actions taken by the City Council to authorize the construction of the asphalt plant or the financing thereof."

Except as to the mention of financing, to which reference will be made hereinafter, there is ample evidence in the record to sustain a finding that the action of the council was not arbitrary, unreasonable, or wasteful. As a result, these findings will not be interfered with by this court. The general rule is stated in 18 McQuillin, Municipal Corporations (3 ed.) § 52.21, as follows:

"In the absence of fraud or of a gross abuse of discretion, a tax-

payers' suit may not be used to control or interfere with the discretion of a municipal board or officer. Thus, such a suit ordinarily does not lie to control official discretion with respect to the expenditure of public funds, the leasing of municipal property, the demolishing of public buildings, the settlement of claims, the interposing of defenses to actions against the city, and the changing of the name of a town. Likewise, in the absence of bad faith the cost of a municipal improvement is in the discretion of the common council and cannot be interfered with by injunction in a taxpayers' suit.

"Discretionary powers relating to the management of a public utility by a municipality will not be interfered with by injunction at the instance of taxpayers; in such a situation the city acts usually in its proprietary capacity, even though expenditures of public funds may be incidentally involved or affected. Thus, the furnishing of electric current to private consumers would not be enjoined although it was alleged machinery and equipment of the city plant was thereby overtaxed at times when current was needed to light city streets."

See, also, 2 McQuillin, Municipal Corporations (3 ed.) § 10.33; Village of Edina v. Joseph, 264 Minn. 84, 119 N. W. (2d) 809; Griswold v. County of Ramsey, 242 Minn. 529, 65 N. W. (2d) 647; Linster v. Luecke, 186 Minn. 386, 243 N. W. 395.

■ We come then to the final and probably crucial issue in the case. Plaintiffs contend that the city is attempting to finance the acquisition of the new asphalt plant in a manner prohibited by its charter. While much evidence is directed toward the trial of this issue, the trial court made no finding on it at all except for the reference to financing quoted above. The only other reference to this question is to be found in the court's memorandum in a footnote, which reads as follows:

"Plaintiff's most persuasive argument appears to be the City's lack of procedural authority to expend the funds, pressed with reliance on Kiichi v. Minnesota Brush Electric Co., 58 Minn. 418, 59 N. W. 1088 (1894). *No attempt is herein made to give an extended discussion on this point because it is not quite clear how the City Council went about authorizing the expenditure.* However, under Chapter 5, Section 17 of the Charter, entitled Permanent Improvement Fund, the City

has authority to use the funds for permanent improvements not otherwise provided for by law. The City may levy a tax to replace expenditures made from the fund. Therefore, the City does not need a separate fund or the total funds necessary for construction. The City can levy future taxes to pay back any expenditure taken out of the Permanent Improvement Fund." (Italics supplied.)

Plaintiffs are entitled to a more definite finding on this issue. It may well be decisive of the case. The evidence is far from satisfactory in showing how the city proposes to finance the plant. There are limitations in the charter on the city's power to proceed without having funds available with which to pay for the new plant. Undoubtedly the burden rests on plaintiffs to show failure to comply with the charter before they are entitled to injunctive relief, but the evidence goes far enough here so that the city should come forth and show what has been done in that respect. Until the trial court has made findings as to the sufficiency of compliance with the charter requirements, there is nothing for us to pass on. Even if laches might be a defense to objections to operation of the existing plants, it could hardly permit an unlawful expenditure of the city's funds for acquisition of a new plant. These are fact issues, and until they are determined the case cannot be fully disposed of. It is not necessary to retry the issues that may now be determined. The case is therefore remanded to the trial court for a retrial of the issue as to whether the method of proposed financing meets the requirements of the city charter.

Reversed with directions.