# ASSOCIATED CONTRACTORS, INC., AND OTHERS v. MIDWEST FEDERAL SAVINGS AND LOAN ASSOCIATION AND OTHERS.

232 N. W. 2d 740.

July 18, 1975—Nos. 44598, 44608, 44612, 44617, 44811.

*Kenneth W. Green* and *Lee N. Johnson,* for plaintiffs.

*Thompson, Hessian, Fletcher, McKasy & Soderberg, Harold J. Soderberg, David B. Morse, Barbara Lindsey Sims,* and *John J. McKasy,* for defendant Midwest Federal.

*Efron & Kittler, Stanley Efron,* and *Arlene M. Vickers,* for other defendants.

Heard before Sheran, C. J., and Otis, Kelly, Todd, Yetka, and Chanak, JJ., and considered and decided by the court en banc.

TODD, JUSTICE.

Defendants, other than Midwest Federal Savings and Loan Association (Midwest), appeal from an order denying their motion for amended findings of fact. The order appealed from also requires defendants to account to plaintiffs regarding transactions arising out of a "caretaker agreement" entered into between plaintiffs and defendant Lawrence G. Malanfant. Plaintiffs also appeal from the portion of the order dismissing Midwest as a defendant and denying their motion for amended findings of fact.[1] We remand to the lower court for a determination of the validity of releases executed by plaintiffs which would preclude an accounting action. We affirm as to the dismissal of defendant Midwest.

This matter came for trial on numerous issues framed by the pleadings. By stipulation of all counsel, the sole issue presented for initial determination was plaintiffs' entitlement to an accounting from defendants. The evidence and exhibits in this proceeding are voluminous and cannot be set forth in detail.

Briefly summarized, plaintiffs and their associated enterprises were in financial difficulty and unable to meet their obligations in the fall of 1963. Plaintiffs contacted defendant Malanfant and negotiated a caretaker agreement on December 3, 1963. Shortly

---

[1] Discretionary review was granted the parties by order of this court. Rule 105, Rules of Civil Appellate Procedure.

after this time, plaintiffs, were indebted to Ben Franklin Savings and Loan Association[2] in the amount of $2,300,000 for various real estate loans. Malanfant, pursuant to the terms of the agreement, assigned his interest to defendant National Funds, Inc., by instrument dated December 5, 1963, although the evidence raises serious doubt that the assignment was executed on this date. The individual plaintiffs became employees of National Funds, Inc., and received other compensation. The companies were liquidated and plaintiffs were relieved of their personal liability. Midwest alleges that it sustained losses of $2,000,000 as a result of its dealings with plaintiffs. It is clear that no separate account was maintained by the caretaker and that plaintiffs' assets were commingled with defendants' during the course of liquidation, all in violation of the caretaker agreement.

In June 1964, Peat, Marwick & Mitchell (PMM) conducted an independent audit of National.[3] In order to analyze fully National's cash and receivables accounts, confirmation letters were sent to Ben Franklin and the individual plaintiffs setting forth summaries of receipts and expenses of which they had knowledge. Ben Franklin confirmed the figures, as did the individual plaintiffs. Lyle Murray, one of the individual plaintiffs, admitted the authenticity of his signature, but denied having seen the accounting sheets attached to the letter. He also asserts that he was unaware of many facts when he executed the confirmation.

By letter of June 30, 1964,[4] plaintiffs agreed with Dwellings, Inc., and Malanfant that National was to receive $291,727 as its minimum compensation and reimbursement for costs and expenses; that the remaining assets of plaintiffs amounted to $379,865; that National was to receive 50 percent of the remain-

[2] Ben Franklin Savings and Loan Association was subsequently acquired by Midwest Federal Savings and Loan Association and the two will hereafter be referred to interchangeably.

[3] Peat, Marwick & Mitchell served as auditors for Associated Companies prior to the December 1963 caretaker agreement.

[4] Most of the liquidation was completed by June 30, 1964.

ing assets as income; that no further services were required of National; and that such compensation settlement was made in full recognition of any agreements to the contrary. On November 1, 1964,[5] plaintiffs entered into an agreement with Malanfant and National which according to defendants provided:

"(1) National has now fully performed all things required in the letter agreement of December 3, 1963 (the 'Caretaker Agreement');

"(2) National had exchanged properties for properties of the Associated Companies; had disbursed certain of its own funds for the Associated Companies' debts and had acquired some of the Associated Companies' property;

"(3) In full payment of assets and property received from Plaintiff-Appellants, National was to issue and Plaintiff-Appellants agreed to accept 300,000 shares of National's Capital stock;

"(4) National was to pay Associated $40,000.00 so that Associated could pay certain debts in Florida;

"(5) National was to pay Murray $11,100, of which part was to be used by Murray to repay prior advances made by National and part to buy a car from National;

"(6) National was to hire Murray for one year with an $18,000 advance and a monthly automobile allowance;

"(7) National released Lyle Murray from advances previously made;

"(8) *Plaintiff-Appellants released National (and Lawrence G. Malanfant) from all 'claims, demands, actions or causes of action, known or unknown, whatsoever.'*" (Italics supplied.)

On August 20, 1965, plaintiffs, National, and Ben Franklin agreed to terminate the caretaker agreement of December 3, 1963, and the June 8, 1964, agreement between National and Ben Franklin. These agreements were terminated without effecting a release of any rights or obligations then existing. By further agreement of March 9, 1966, the Murrays agreed with Malanfant

---

[5] This is also referred to as the November 1 agreement.

and National that subject to issuance by National of 300,000 shares of National stock, "all accounts are settled and paid in full." The National stock was not delivered to the Murrays. Malanfant testified that the Murrays refused delivery because of adverse tax consequences. Lyle Murray denied that this was the reason for the nondelivery. The stock was tendered to the Murrays prior to trial, but was refused.

■ The trial court made extensive findings of fact and conclusions of law in ordering an accounting between the parties and in dismissing Midwest from the action. However, the findings of fact and conclusions of law that the trial court did not make are so critical to a resolution of the accounting issue that a remand is necessary.

The trial court found:

"The relationships in this case between the Plaintiffs, the Malanfant Defendants and their respective affiliates and subsidiaries are so complex that this Court cannot make a definitive finding as to the Plaintiffs' claims of fraud or the Malanfant Defendants' defenses: (a) that the Malanfant Defendants and their affiliates and subsidiaries had, in fact, accounted to the Plaintiffs; (b) that all duties and obligations of the Malanfant Defendants and their affiliates and subsidiaries under the Caretaker Agreement had been released and discharged by the Plaintiffs; but the failure of the Malanfant Defendants to keep a separate bank account and the obvious commingling of assets requires that there be a mutual accounting as between the Plaintiffs and the Malanfant Defendants and their respective affiliates and subsidiaries."

On remand, the trial court must decide the asserted defenses of release, prior accounting, and accord and satisfaction, as well as plaintiffs' claim of fraud. The difficulty of determination cannot be the basis for refusing to make necessary findings. See, Borgelt v. City of Minneapolis, 271 Minn. 249, 135 N. W. 2d 438 (1965). If the defenses are found to exist, plaintiffs' action for

an accounting will be barred. However, plaintiffs have the opportunity of proving fraud, duress, or undue influence in order to counter such defenses. If the defenses asserted by defendants are not established, or if plaintiffs can negate the defenses, the accounting shall proceed as to the defendants other than Midwest Federal.

As to the dismissal of Midwest Federal, we find that the record adequately supports the trial court's determination.

■ Defendants have also challenged that part of the order assessing expenses of the accounting against the parties. The court found:

"It is further found that due to the nature of the dealings and transactions between the Plaintiffs, the Malanfant Defendants and their respective affiliates and subsidiaries and giving due consideration to the press of Court business, the accounting between said parties will require the appointment of a Referee. Therefore, the Court finds as a necessary prerequisite to the commencement of the accounting that a fund be established under control of the Court in order to provide for payment of the expenses of said accounting, including compensation of the Referee."

The Malanfant defendants[6] point to Rule 53.01, Rules of Civil Procedure, in challenging the court's assessment of referee costs against the parties in view of the court's statement that the appointment of the referee was necessitated by the press of court business.

Rule 53.01, Rules of Civil Procedure, provides in part:

"The court in which any action is pending may appoint a referee therein. When the court shall state in its order of appointment that the reference is made necessary by press of business, the fees of the referee, as taxed and allowed by the court, shall be paid out of the county treasury, as the salaries of county officers are paid. In other cases the compensation to be allowed

---

[6] Plaintiffs have not addressed themselves to this issue.

to a referee shall be fixed by the court, and shall be charged upon such of the parties or paid out of any fund or subject matter of the action which is in the custody and control of the court as the court may direct."

Under this rule, the court cannot tax the costs of the referee if the appointment was necessitated by the press of court business. On remand, the court is not precluded from reexamining its findings in this regard.

Affirmed in part; reversed in part; and remanded for proceedings consistent with this opinion.